## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

ABX AIR, INC.,               )
145 Hunter Drive         )
Wilmington, OH 45177    )
                      )
Plaintiff,            )
                      )    CIVIL ACTION NO. _____
     v.             )
                      )
INTERNATIONAL BROTHERHOOD OF )
TEAMSTERS, AIRLINE DIVISION;  )
25 Louisiana Ave NW,     )
Washington, DC 20001    )
                      )
AIRLINE PROFESSIONALS ASSOCIATION )
OF THE INTERNATIONAL BROTHERHOOD )
OF TEAMSTERS, LOCAL UNION NO. 1224; )
2754 Old State Route 73   )
 Wilmington, OH 45177    )
                      )
Defendants.          )

## VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff ABX Air, Inc. ("ABX") brings this action for injunctive relief, declaratory relief, and other appropriate relief under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against Defendants, International Brotherhood of Teamsters ("IBT") and Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively, "Defendants").

## INTRODUCTION

1.     ABX seeks injunctive relief, declaratory relief, and other appropriate relief against Defendants for violations of Section 2, First of the RLA, Section 6, First of the RLA, and Section 204 of the RLA.

2.      As detailed below, Plaintiff and Defendants are currently engaged in bargaining under Section 6 of the RLA for a successor collective bargaining agreement.  In the parlance of the RLA, 45 U.S.C. §§ 151 *et seq.*, the parties are engaged in a so-called "major dispute."

3.      Under the RLA both parties are required to adhere to the status quo until the processes established by the RLA for the resolution of major disputes have been exhausted.

4.      Those processes are not exhausted until the National Mediation Board ("NMB"), the federal agency tasked with supervision of labor relations in the rail and air industries, finds the parties are at impasse, makes a proffer of interest arbitration that is not accepted by both parties, a 30-day cooling off period expires, and no Presidential Emergency Board is convened.

5.      The parties' negotiations are presently being conducted with the mediatory assistance of the NMB under Sections 5 and 6 of the RLA, 45 U.S.C. §§ 155, 156, and those major dispute resolution processes have not been exhausted.

6.      Despite their legal obligation to adhere to the status quo, Defendants are engaged in an unlawful campaign to exert economic pressure on ABX through various concerted efforts in order to coerce ABX to accede to their bargaining demands during negotiations for a successor agreement to the parties' current collective bargaining agreement.

7.      Defendants' concerted actions have resulted in ABX's pilots accumulating a backlog of days off.  As ABX pilots utilize these ill-gotten days off, ABX is experiencing an interruption to service through flight delays and cancellations.  If left un-remedied, ABX will experience crucial flight failures within days.

8.      On October 27, 2016, ABX was forced to notify a customer that is could no longer meet its contractual obligations to fly for that customer due to lack of available flight crews.

9.     Because ABX has not caved to Defendants' demands, Defendants are threatening an imminent strike.  Upon information and belief, the strike will begin either November 1 or November 2, 2016.

10.     One of the express purposes of the RLA is to "avoid any interruption to commerce or to the operation of any carrier engaged therein."  45 U.S.C. § 151a.  This principle is reflected in Section 2, First of the RLA (45 U.S.C. § 152, First) which imposes a duty on "all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."  (Emphasis added.)

11.     The principle of avoiding interruptions to commerce in the airline industry is also reflected in the RLA's major dispute resolution process.  The major dispute procedures are "virtually endless" and "purposely long and drawn out."  *Burlington N. R.R. Co. v. Maint. of Way Employees*, 481 U.S. 429, 444 (1987); *Railway Clerks v. Florida E. Coast R.R. Co.*, 384 U.S. 238, 246 (1966).

12.     A union may not engage in self-help or strike until those lengthy procedures have been exhausted.  Under the RLA, a concerted refusal to work overtime and/or cause slowdowns may constitute a violation of this procedural requirement.  Similarly, a union cannot strike.

13.     ABX is responsible for shipping time-sensitive freight on behalf of its two primary clients: DHL Network Operations (USA), Inc. and its affiliates ("DHL") and Amazon Fulfillment Services, Inc. ("AFS"), a subsidiary of Amazon.com, Inc. ("Amazon").  Beginning in early November of each year, ABX begins its peak season, relating to shipping during the

Christmas holiday season. Based on the timing of Defendants' actions, the Christmas shopping and shipping season could be severely impacted if flights full of freight for DHL and Amazon are cancelled because of Defendants' illegal labor actions, which could result in millions of dollars of freight and packages not timely being delivered to retailers and homes.

14. Because Defendants' concerted efforts, negotiation tactics, and threatened strike are directly at odds with the RLA, and because substantial and irreparable harm would result to ABX and its customers if such an actions were permitted to occur, the Court should grant a temporary restraining order and preliminary and permanent injunctive relief as requested by ABX.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case arises under the laws of the United States, specifically the RLA, 45 U.S.C. §§ 151, *et seq*. Jurisdiction also is appropriate under 28 U.S.C. § 1337, as the RLA is a law regulating commerce.

16. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the suit occurred here.

## PARTIES

17. ABX is a corporation organized and existing under the laws of the State of Delaware, with its principal offices in Wilmington, Ohio.

18. ABX is a FAR Part 121 cargo airline flying express cargo routes for customers in the U.S. and around the world, making it a "common carrier by air engaged in interstate or foreign commerce" within the meaning of 45 U.S.C. § 181 and, therefore, subject to the RLA.

19. ABX transports time-sensitive materials nationwide. From Amazon's sort center in Wilmington, Ohio and DHL's sort center in Hebron, Kentucky, ABX services 43 cities in the

United States and other countries with company-owned or leased aircraft. ABX carries perishable goods for shipment that may be destroyed by even a short delay, and it ships hazardous materials that may pose safety risks if delivery is untimely. It also carries company payrolls, computer parts critical to the operations of innumerable businesses, and documents essential to financial and real estate transactions and litigation.

20. ABX has two primary customers. One is DHL; approximately 20,742 block hours flown by ABX are flown pursuant to a contract between DHL, ABX, and ABX's affiliate, Cargo Aircraft Management, Inc. Another is Amazon; approximately 6,580 block hours flown by ABX are flown pursuant to a contract between Amazon, ABX, and ABX's affiliate, Airborne Global Solutions, Inc.

21. ABX's customers, such as DHL and Amazon, expect ABX to provide on-time, immediate delivery of their goods and materials; both have set a reliability standard in excess of 98%.

22. ABX is a wholly owned subsidiary of Air Transport Services Group, Inc. ("ATSG"), a publicly traded company (NASDAQ National Market).

23. ATSG is also the parent company of Air Transport International, Inc. ("ATI"). ATI is an air carrier which utilizes B767-200, B757-200, and B757 Combi freighter capacity. ATI has its own contracts with DHL and Amazon to ship freight using its B767-200 and B757-200 aircraft (similarly to ABX); ATI also contracts with the Department of Defense to transport military personnel and equipment with its B757 Combi aircraft.

24. ATI's flight deck crewmembers are represented by a separate, rival union, the Air Line Pilots Association, International ("ALPA"). There is a collective bargaining agreement between ATI and ALPA (the "ATI/ALPA CBA") that establishes the rates of pay, rules, and working

conditions applicable to that relationship.  ATI and ALPA are currently engaged in bargaining for a successor CBA under Section 6 of the RLA.

25.     Defendant IBT is an unincorporated labor organization headquartered in Washington, D.C.  It is the collective bargaining representative of the ABX pilots under the RLA.

26.     Defendant Local 1224 is an unincorporated labor organization headquartered in Wilmington, Ohio.  It is a chartered affiliate of Defendant IBT, and as such, it provides labor representation services to pilots represented by IBT employed at numerous airlines throughout the United States.  On information and belief, Local 1224 represents the pilots at all of the carriers who contract with DHL for service in the United States EXCEPT the pilots at ATI who are represented by ALPA.  On information and belief, IBT has delegated to Local 1224 the exclusive responsibility for providing day-to-day representation to the ABX pilots represented by IBT.

27.     On information and belief, Defendant Local 1224 and Defendant IBT transact business within the jurisdiction of this Court.

## THE DISPUTE

**The Parties' Collective Bargaining Agreement and Labor Negotiations**

28.     ABX and IBT are parties to a collective bargaining agreement, which took effect in 2010. See Exhibit 1, 2009-2014 ABX-IBT Collective Bargaining Agreement (the "Agreement").

29.     Pursuant to Article 1, Section B of the Agreement, the Union and the pilots are to cooperate fully with ABX so as to attain efficient operations of the Company.

30.     Pursuant to Article 25 of the Agreement (Duration), the parties exchanged Section 6 notices and began collective bargaining for a successor labor agreement in December 2013.

31.     The parties have been in mediated negotiations under the auspices of the NMB, pursuant to Section 6 of the RLA, since August 2014 when Mediator James Mackenzie was appointed.

32.     Local 1224 has advocated for specific proposals regarding Article 1 of the Agreement (Scope and Duration).  Specifically, Local 1224 demanded all flights for DHL in DHL's North American network be operated by crewmembers on the ABX seniority list. In other words, Local 1224 has demanded that the work presently being done by ATI pilots, and covered by the ATI/ALPA CBA, be transferred to Local 1224's members.  Alternatively, it would require the merger of ABX and ATI.

33.     Again, ABX and ATI are separate companies owned by the holding company ATSG. Both ABX and ATI provide services to DHL and Amazon; Local 1224 demands that ABX be given all of the DHL and Amazon work whether through a work transfer or merger.

34.     On November 18, 2014, Local 1224 submitted a formal proposal regarding changes to Article 1 of the Agreement.  In that proposal, Local 1224 demanded that all flights on behalf of DHL in DHL's North American network – including those presently performed by ATI – be operated by an ABX Crewmember (Section 1.E.1.e.); and that ATI in the future could operate only aircraft then "currently listed on the ATI operating certificate," which would effectively prevent ATI from ever growing in the future (Section 1.E.2.a.).

35.     On October 14, 2015, Local 1224 submitted a second proposed revision of Article 1 of the Agreement.  That proposal – in proposed Section 1.E.1.d – would require ATI to cease all flying for DHL and Amazon and to transfer to ABX and its IBT-represented pilots all that work currently done by ATI's ALPA-represented pilots.

36.     In discussions across the bargaining table, and in discussions away from the bargaining table, among Richard Ziebarth ("Ziebarth"), Executive Committee Chairman of Local 1224 for

the ABX pilots, John Starkovich ("Starkovich"), President of ABX, and Robert Boja ("Boja"),
Vice-President of Flight Operations at ABX, Ziebarth has demanded that ATI and ABX be
operationally merged, or effectively merged to form a "single carrier" under the RLA.

37.     IBT's demands that ATI's flying for DHL and Amazon be transferred to ABX, and that
ABX and ATI be merged in any manner or respect, is outside the authority of ABX.  ABX has
no authority or control over ATI.  Any question related to the status of the relationship between
ABX and ATI – whether they might be merged or should remain separate – is an issue that can
only be addressed by the two carriers' parent company, ATSG.

38.     ATSG is not a "carrier" under the RLA and has no duty or obligation under the RLA to
negotiate with IBT or Local 1224.  Accordingly, ATSG has no duty to bargain with Defendants.

39.     The Defendants' demands that ATI's flying for DHL and Amazon be transferred to ABX,
and that ABX and ATI be merged, are non-mandatory subjects of bargaining over which
Defendants and ABX's pilots would not be permitted to engage in self-help, even if all the
RLA's major dispute resolution processes had been exhausted.

40.     Defendants' demand would require the transfer of work that is covered by the ATI/ALPA
collective bargaining agreement to ABX and its IBT-represented pilots, which would interfere
with the rights of ATI pilots under their agreement.

41.     ABX has not, and cannot, agree to Defendants' demands regarding merger with ATI.
Further, ABX has no duty or obligation to bargain with Defendants over these demands.

**Defendants' Concerted Efforts to Improperly Influence Labor Negotiations**

42.     Beginning in August 2016, Defendants started exerting economic pressure through
concerted activities to increase leverage in labor negotiations.  Those efforts have included a

strike-authorization vote and implicit and explicit instruction to ban open flying and vacation buybacks.

*The Open Flying Ban Changes the Parties' Status Quo*

43.     Under the Agreement, each of ABX's crewmembers has the opportunity to bid, each bid period (each of which equates, generally, to a month), for what is referred to as a "line of time." These "lines" are awarded in seniority order and represent the work schedules for the bid period for the crewmembers to whom they are awarded.

44.     When these lines are constructed it is never possible to incorporate into them all of the known flying for any particular bid period.  Also, flight assignments commonly drop out of crewmembers' lines because of training, vacation, leaves of absence, and other causes.  The flight segments and trips (comprised of multiple flight segments) that are left over after the lines are constructed and awarded, along with the flight assignments that drop out of assigned lines, are referred to as "open flying."

45.     Since implementation of the initial labor agreement between the parties in 1992, the primary method by which open flying has been distributed to crewmembers is through a seniority-based bid and award process.  That remains true under the Agreement.

46.     Also since implementation of the 1992 labor agreement, ABX's staffing model has depended upon crewmembers voluntarily bidding for open flying.  ABX keeps no crewmembers on staff solely to cover these open trips.  When the Agreement and predecessor labor agreements were negotiated, both ABX and Local 1224 were aware that ABX depends upon crewmembers voluntarily bidding for open flying when deciding how many crewmembers it needs for each position in each aircraft type it operates.  There is no other reasonable way in which to staff for

the daily, weekly, and monthly variations in the volume of flying demanded by ABX's customers.

47.     There has been a pool of open flying every bid period since ABX started operating under its current general scheduling model more than two decades ago.  Indeed, given the method by which lines of time necessarily are constructed, bid, and awarded, a certain volume of open flying is unavoidable.

48.     The Union bargained for the current general model for distribution of open flying in the parties' 1992 labor agreement.  This model requires ABX to rely heavily on its crewmembers to bid for and fly the open flying trips.  In exchange, crewmembers earn extra income when they perform open flying.

49.     If insufficient crewmembers bid for open flying, ABX may utilize an "emergency" process, known as "junior manning," (i.e. involuntary overtime) to assign pilots to the open flying lines.

50.     Under junior manning, pilots who can perform the flight without causing a delay are assigned open flights in order of reverse seniority.

51.     Pilots who are junior manned are given premium pay.

52.     If a pilot is junior manned on a scheduled day off more than six (6) times in a calendar year, ABX must provide that pilot with a replacement day off during the same or the following bid period to replace the day lost due to junior manning ("D6 Day").

53.     D6 Days were created with an understanding that pilots voluntarily bid on open flying, which makes resorting to junior manning the exception rather than the rule; D6 Days have been used under a long-standing past practice that pilots voluntarily bid on open flying.

54.     Junior manning and the consequent creation of D6 Days was never intended to be used to assign all, or even most, of the open flying during a bid period; one of the predicates to the Agreement is an understanding that, indeed, a significant portion of ABX's crewmembers will bid for open flying.  Traditionally, ABX operates with minimum need for junior manning because pilots willingly and voluntarily bid on open flying.

55.     When no crewmembers voluntarily bid for open flying, the predictable result is that ABX will have to junior man those flights.  Consequently, pilots will accumulate compounding D6 Days.  This process creates an operational "bottleneck" or "snowballing effect" in which ABX is unable to staff flights because of the accrued D6 Days.

56.     For example, when a pilot receives a D6 Day it results in a previously scheduled workday becoming a day off in the current bid month or, if there are insufficient work days in the current bid month, in the subsequent bid month.  A pilot can be junior manned on a previously scheduled workday that was turned into a day off by a D6 Day.

57.     Under the Agreement, a pilot can be junior assigned no earlier than five (5) days before the assignment.  The process of assigning trips through the junior assignment process is time consuming and has never been used at the volume currently being experienced.  As the volume of D6 Days expands (because pilots are not bidding on open flying), ABX's ability to properly complete the assignment process and to successfully contact pilots to give them junior man assignments, has been and will be impaired, and the Company has not and will not be able to successfully man flights.  This has caused and will continue to cause the snowballing effect of D6 Days leading to junior manning which leads to more D6 Days.  The compounding D6 Days will inevitably cumulate in ABX's increased inability to staff flights, cancelling deliveries for DHL and Amazon.  Based on the timing of Defendants' concerted efforts to ban open flying, this

bottleneck appears imminent for the Christmas holiday, peak shipping season unless pilots return to the status quo of voluntarily bidding on open flying time.

58.     If ABX is unable to assign crewmembers to all the available open flying, or otherwise fill the necessary crew positions (*e.g.*, using management crewmembers), it will suffer a service failure that will alienate ABX's customers and those who have entrusted their documents, goods, and materials to ABX and its customers.

*Defendants Have Sponsored, Controlled, Timed, Coordinated, and Enforced the Ban on Open Flying*

59.     Defendants' concerted ban on open flying is directly responsible for the increased costs associated with junior manning and ABX's inability to assign pilots to all scheduled flights.  The ban on open flying was sponsored, controlled, timed, coordinated, and enforced by Defendants.

60.     This concerted refusal by the crewmembers to bid for open time is unlawful self-help that Local 1224 and its constituents are using in order to try to compel ABX to agree to its proposals during bargaining.  It is, in other words, an attempt by Local 1224 and its constituents to change the parties' labor agreement through self-help rather than through the bargaining process.

61.     On several occasions in the past, the Local 1224's Executive Council has instigated and encouraged its members to engage in concerted refusals to bid open flying.  It has done so by announcing that the Executive Council would not bid for open time.  These announcements have been followed by precipitous drops in the number of crewmembers bidding for open flying.  For example, in late June 2016, the Executive Council announced that its members would not bid for open flying and the amount of open flying bids dropped dramatically.

62.     In June 2016, the Executive Council issued an e-mail to all crewmembers stating crewmembers are not required to bid on open time and were not required to answer calls from scheduling on a day off.  Further, the Executive Council stated they "would no longer carry the

water for ATSG [bidding on open time]" until ABX consented to certain labor negotiations regarding the scope of the Agreement.  See Exhibit 2, June 2016 Executive Council E-mail to crewmembers.

*Crewmembers Do Not Voluntarily Bid on Open Flying*

63.     During the 12 months preceding the May 2016 bid period, virtually all of the available open flying in any particular month was bid for by, and awarded to, crewmembers.  ABX is staffed with the understanding that that practice will continue.  Thus, while any individual crewmember might decide to bid, or not to bid, for open flying in any particular month, ABX also must rely on the continuing practice and proposition that, if crewmembers are truly making independent decisions about performing open flying, it will always have sufficient crewmembers who will bid for it.

64.     In September 2016, only 0.013% of the available open flying was bid for and awarded to crewmembers.

65.     In May 2016, ABX's costs associated with junior manning were approximately $295,000.00.  In June 2016 (after the Local 1224's e-mail regarding junior manning, which is described below), ABX's costs associated with junior manning almost doubled – rising to approximately $560,000.00.  In July 2016, ABX's costs associated with junior manning more than doubled again – rising to approximately $1.3 million.  In August 2016, ABX's costs associated with junior manning rose to approximately $1.8 million.  In September 2016, ABX's costs associated with junior manning rose to approximately $2.4 million.

66.     ABX's costs associated with junior manning are currently at unprecedented levels.

67.     In 2014, the average monthly cost associated with junior manning was $127,685.00.  In 2015, the average monthly cost associated with junior manning was $313,328.00.  The average

monthly cost associated with junior manning from June 2016 to September 2016 is $1,506,631.00.

68.     85% of ABX crewmembers are accumulating D6 Days through junior manning.  10% of ABX crewmembers have accumulated enough D6 Days through junior manning to have an entire bid period of days off.

69.     66% of ABX's current flight schedule for the month of November is designated as Open Flying because of the use of D6 Days to turn previously scheduled workdays into days off. Because crewmembers are not bidding for open flying, virtually all of the trips on those days will have to be assigned through the laborious method of junior manning.  That includes flights operating on Thanksgiving and the surrounding days.

70.     ABX crewmembers are also not answering calls from scheduling, which they know will result in junior manning.

71.     Thus, the junior manning process is further complicated by crewmembers concerted efforts to avoid calls from crew scheduling.

72.     Defendants' actions have resulted in management pilots flying trips, which take them away from training the new hires and from keeping existing pilots current and qualified to fly.

73.     While ABX has attempted to award each D6 day to coincide with the crewmembers' requested day off, Defendants' concerted action has made that impossible because of the sheer number of unanticipated D6 Days being accrued due to the inordinate amount of junior manning required in order to continue operations.

74.     Immediately following the June email regarding open flying, ABX's costs for junior manning have more than tripled.

75.    On October 17, 2016, Starkovich and Boja discussed the junior manning cost increase with Ziebarth, on behalf of Local 1224.  Ziebarth responded by asking "what will the union get" in exchange for normalizing the junior manning costs.

76.    On October 19, 2016, Ziebarth, on behalf of Local 1224, told Starkovich and Boja that junior manning costs would normalize if he could verbally commit to accepting revisions to Article 1 of the Agreement requiring that ABX do all the DHL and Amazon flying and that ATI be merged into ABX.

77.    Through discussions with Local 1224 regarding the increased operational costs, executives of Local 1224 admitted responsibility for and control over the increased costs of junior manning.

78.    Defendants' representatives stated during labor negotiations that ABX pilots would resume bidding on open flying if ABX would concede to demands regarding revisions to the Recognition and Scope provisions of the Agreement – in particular, the merger of ABX and ATI or the transfer of all ATI's freight operations to ABX.

79.    ABX pilots have stated that they desire to bid on open time but have been banned by Local 1224 from bidding.

80.    The independent decisions by crewmembers to bid on open flying are no longer being made as was the parties' historical practice (i.e. *status quo*); rather, the crewmembers are following the Executive Committee, in lock-step, in refusing to bid for open flying in order to coerce ABX into acceding to its demands over non-mandatory subjects of bargaining.

81.    In August 2015, Local 1224 established a mass texting service (SMS) to allow union leadership to communicate simultaneously with members.  One of the purposes of this communication system is to coordinate the open flying ban and additional RLA violations.

82.     In May 2016, Local 1224 voted on whether to authorize a strike of ABX crewmembers; the strike was authorized.

83.     In June 2016, Local 1224 emailed all ABX crewmembers to state that the text message communication system would be used to communicate the date and time of any work stoppage. Crewmembers would receive a text message from Local 1224 that read "Hotel Tango Papa" to indicate a work stoppage.  Local 1224 promised to provide funds to cover the cost of airline tickets used to return crewmembers home in the event of a strike.

84.     On October 28, 2016, Ziebarth informed Boja that if ABX does not award the D6 Days like it has in the past the union "will shut them down" on November 1, 2016.  Later that day, an ABX captain informed ABX that Defendants had set a strike date of November 2, 2016.

*The Vacation Buy Back Ban Changes the Parties' Status Quo*

85.     ABX also uses a process known as "vacation buyback" to pay pilots for their vacation time, which allows pilots to fly additional open trips or bid on additional lines.  The vacation buyback provisions create pilot availability by decreasing pilot vacation days.  The less vacation ABX buys back, the less availability pilots have for bidding on trips, which results in ABX's additional and costly use of junior manning.

86.     The June 2016 email from Local 1224's Executive Council also stated that crewmembers do not have to allow ABX to buy back vacation.  Significantly, crewmembers then stopped using that procedure.

87.     Between May and December 2016, ABX bought back an average of 354 vacation hours per month.  In June and July 2016 (after the Local 1224's email), ABX bought back approximately 28 hours of vacation each month.  In August 2016, ABX bought back zero vacation hours.  In September 2016, ABX bought back approximately 65 hours of vacation.  This

is in stark contrast to the same time period in the prior year in which ABX bought back an average 389 hours of vacation time in those same months.

88.     Defendants' concerted ban on vacation buyback is directly responsible for the increased costs associated with junior manning and ABX's inability to assign pilots to all scheduled flights. The ban on vacation buyback was sponsored, controlled, timed, coordinated, and enforced by Defendants in an unlawful effort to exert economic pressure to influence labor negotiations.

89.     It is clear that Defendants do not intend to fulfill their statutory duty to prevent and stop unlawful self-help by their constituency.  That is, of course, because Defendants are responsible for this unlawful action.

90.     Should Defendants continue these unlawful concerted efforts for its bargaining purposes, ABX and its customers will be significantly impacted.  Defendants' concerted actions will continue to cost ABX millions of additional dollars in increased operational costs.  Beyond that, Defendants' concerted actions will, in the immediate future, significantly interrupt interstate commerce by rendering ABX incapable of assigning pilots to trip schedules, resulting in additional flight cancellations.

**The Irreparable Injury to ABX, Its Customers, and the Public by Defendants' Unlawful Job Actions**

91.     ABX will suffer irreparable injury in the absence of preliminary injunctive relief.  Even a one-day strike could cost the company in excess of $1 million in lost revenue and cancelled flights.  A strike would also damage ABX's goodwill with DHL and Amazon.

92.     Additionally, as a result of Defendants' unlawful actions, including banning bids on opening flying and banning vacation buybacks, ABX has been unable to assign all the available open flying to qualified crewmembers, resulting in service failures in the form of cancelled flights and delays.

93.     Moreover, upon information and belief, pilots from other cargo airlines who are also represented by IBT will sympathize with a strike on ABX, potentially leading to an extension of a strike beyond ABX.

94.     Unless the Court enjoins this concerted refusal by ABX's crewmembers to bid for open flying and to refuse the vacation buyback program, and requires Local 1224 to take strong affirmative action requiring its constituency to resume their normal practice of bidding for open flying and allowing vacation buybacks, ABX will continue to be unable to assign all the available open flying to qualified crewmembers.  That will result in further service failures in the form of canceled flights or delays.

95.     When this service failure occurs either due to a strike or to inability to staff its flights, ABX will not be able to deliver a full aircraft-load of packages in a timely manner to its customers.  As many as 20,000 individual customers of DHL and Amazon could be affected by such a service failure.  Those customers could be entitled to demand refunds.  More important, and irreparable, ABX's reputation will be damaged, and the affected customers (including DHL and Amazon) could be alienated from ABX and could cease doing business with ABX.

96.     Given the timing of the peak holiday season, Defendants' actions could result in imminent and irreparable harm to ABX, ABX's customers, and the millions of individuals who rely on DHL and Amazon to deliver on time during the Christmas holiday season.

97.     ABX is in a fiercely competitive business and can ill afford to upset or lose customers, particularly DHL or Amazon.  As a direct result of the imminent strike and concerted refusal to bid for open flying for which Defendants are responsible, ABX's reputation as a reliable carrier, and its relations with its customers, are put in jeopardy, as are jobs of ABX's union and nonunion employees.

**ABX's Effort to Resolve this Dispute without Judicial Intervention**

98.     ABX secured its contract with Amazon in the spring of 2016.  Following agreement with Amazon, ABX has aggressively recruited and hired pilots to ensure that it could meet operational needs.  ABX is appropriately staffed if not for the concerted refusal to bid open time.

99.     ABX has sought to avoid disruption to interstate commerce through increasing pilot hiring, utilizing management to fly lines, creatively scheduling flight routes, turning down additional work from customers, cancelling a contract with a current customer, and referring customers to other providers.  ABX informed a customer that it could not provide service to that customer under one of its two contracts for at least the remainder of 2016.  ABX has incurred millions of dollars in increased operational costs in implementing these efforts to maintain operations in light of Defendants' actions.  Despite the efforts, ABX has had to cancel a contract and cancel flights as a direct result of Defendants' concerted actions.

100.    ABX has made numerous efforts to resolve this dispute without judicial intervention. Only when it became clear that Defendants' actions have interfered with interstate commerce and will continue to interfere with interstate commerce, unless enjoined, did ABX initiate this action.

101.    On October 28, 2016, ABX sent a letter to Defendants asking it to immediately cease and desist from encouraging ABX's pilots not to bid open time and from encouraging ABX's pilots not to buy back vacation time.  ABX also requested that Defendants immediately instruct pilots that they cannot refuse to work days that appear as workdays on their schedules.

102.    ABX continues to be willing to negotiate with Local 1224; however, Defendants' demands regarding the Scope of the Agreement are non-mandatory subjects of bargaining. Further, ABX lacks the authority to acquiesce to their demands; only ATSG could merge ABX and ATI.  Yet, ATSG has no bargaining obligation to Defendants under the RLA.

103.    Moreover, on October 27, 2016, Defendants filed a single carrier petition with the NMB seeking a ruling that ABX and ATI are a single carrier.  The result of any such finding would be that Defendants would represent all the pilots of both airlines – the very outcome about which Defendants have unlawfully insisted on in bargaining with ABX for months.

104.    No money judgment against Defendants could adequately compensate ABX for the financial and operational turmoil and damage to its reputation, caused by the concerted ban on open flying and vacation buyback for which Local 1224 is responsible.  ABX has no adequate remedy at law, as the harm caused to ABX will be irreversible, incalculable, and otherwise irreparable.

105.    The parties' status quo position includes, but is not limited to, ABX crewmembers voluntarily bidding on open flying and participating in vacation buyback.

106.    ABX has satisfied all of its legal obligations in connection with this dispute.  ABX has complied with every obligation imposed by law which is involved in the labor dispute in question and has made every reasonable effort to resolve the dispute.

### COUNT I
### VIOLATION OF SECTION 2, FIRST OF THE  RAILWAY LABOR ACT

107.    The allegations of paragraphs 1 through 106 are incorporated by reference.

108.    Section 2, First of the Railway Labor Act, 45 U.S.C. § 152, First, requires air carriers and labor organizations representing their employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such contracts or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

109.    Defendants have violated their mandatory duty to exert every reasonable effort to resolve its major disputes with ABX.  There is no question that the threatened strike is being directed and sponsored by the Defendants and that, unless enjoined, the Defendants will carry out the strike, causing irreparable injury to ABX.

110.    The on-going concerted ban on open flying bids and vacation buyback, as well as other slowdown tactics, for which the Defendants are responsible, also violates their mandatory duty to exert every reasonable effort to resolve its major disputes with ABX, prior to a release to lawful self-help, without causing "any interruption to commerce or to the operation of any carrier…."

## COUNT II
## VIOLATION OF SECTION 6 OF THE RAILWAY LABOR ACT

111.    The allegations of paragraphs 1 through 110 are incorporated by reference.

112.    Section 6 of the RLA, 45 U.S.C. § 156, requires parties engaged in direct Section 6 negotiations for a revised collective bargaining agreement (*i.e.*, negotiations prior to the involvement of the NMB) to maintain the status quo.  For represented employees, this means that they are forbidden from engaging in strikes or self-help intended to interfere with or disrupt their employer's operations.  For the union that represents those employees, that status quo obligation means that it is forbidden from taking any action to cause, encourage, coordinate, or facilitate unlawful self-help by those employees, including participating in a strike.  It also means that the union has an affirmative obligation – regardless of whether it is in any way responsible for the employees undertaking unlawful actions – to take all reasonable measures to prevent those employees' unlawful self-help from commencing and to stop it if it has begun.  Defendants, herein, have complied with none of those legal obligations in connection with the on-going concerted refusal to bid on open flying and thus have violated Section 6 of the RLA.

113.    The purpose of the concerted refusal to bid on open flying and vacation buyback that Local 1224 has sponsored, encouraged, coordinated, facilitated, and required, and in which ABX's crewmembers are engaged, is to compel ABX to accede to Local 1224's demands in Section 6 negotiations.  Moreover, Defendants have now threatened an imminent strike if ABX refuses to accede to their demands.  That conduct violates Section 6 of the RLA because it is self-help in support of what is termed, in RLA parlance, a "major dispute," and does so before the parties have been released to lawful self-help.  Defendants could only engage in self-help if the NMB released the parties and a 30-day cooling off period expired without a Presidential Emergency Board being established.  As those conditions are not met, Defendants cannot engage in self-help, including a strike.

114.    In the absence of voluntary negotiations, the procedures set forth in Section 6 of the RLA represent the mandatory mechanism for changing the terms of an RLA collective bargaining agreement.  The threatened strike and on-going concerted refusal to bid on open flying and vacation buyback for which the Local 1224 is responsible violates Section 6 of the RLA because they are intended to force ABX to accede to its collective bargaining demands.  It is, in other words, intended to change the parties' Agreement by means of self-help rather than through negotiations.

115.    As to each item of relief sought herein, greater injury will be inflicted upon ABX and the public if such relief is denied than will be inflicted upon Defendants by the granting thereof.  Defendants will suffer no injury if an injunction is issued, inasmuch as they merely will be required to comply with the law.

116.    The injunction also would foster the public interest, as it would prevent a significant interruption to ABX's operations and interstate commerce, a primary goal of the RLA.

**COUNT III**
**VIOLATION OF 45 U.S.C SECTIONS 152, SIXTH AND 184**
**(ILLEGAL SELF HELP IN AID OF A MINOR DISPUTE)**

117.    The allegations of paragraphs 1 through 116 are incorporated by reference.

118.    To the extent that Defendants' actions are motivated by the dispute concerning the interpretation and/or application of the Agreement, that dispute is subject to the mandatory arbitration provisions of 45 U.S.C. Section 152 sixth and Section 184.

119.    Defendants and it members' actions constitute an illegal strike in aid of Defendants' position in aid of a minor dispute, in derogation of their duties to resolve the dispute through arbitration as mandated by the RLA.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff ABX requests that this court provide the following relief:

(1)    Issue a temporary restraining order, a preliminary injunction, and a permanent injunction:

(a)    restoring the status quo and restraining and enjoining IBT, Local 1224, and Local 1224's officers, members, and representatives and all persons acting by, in concert with, through, or under them and each of them, or by and through their orders, and all others acting or participating with them from calling for, permitting, instigating, authorizing, encouraging, participating in, approving of, commencing, or continuing, in connection with the parties' Section 6 negotiations or any other major dispute contemplated by the Railway Labor Act, any disruption, curtailment, or restriction of normal airline operations, including but not limited to strikes, concerted refusals to fly, concerted refusals to bid on open flying, or other work stoppages, and all acts in furtherance or in support thereof; and,

      (b)     directing Local 1224 and said persons to take all steps in their power to prevent said disruption of normal airline operations from commencing or from continuing if commenced, including sending a letter to all crewmembers stating that Local 1224 has violated the Railway Labor Act by encouraging ABX crewmembers to strike and to engage in a concerted refusal to bid on open flying, and directing the crewmembers to refrain from or cease all such activities immediately.

(2)     Issue a declaratory judgment that Local 1224's actions complained of herein, and its crewmember constituents' concerted refusal to bid on open flying and any other economic action undertaken by them against ABX, without compliance with the procedures required by the Railway Labor Act, constitutes joint and individual violations of Sections 2, First, and 6 of the Railway Labor Act, 45 U.S.C. §§ 152, First; 156.

(3)     Issue an Order providing the following additional relief:

      (a)     ABX pilots who are members of Local 1224 shall have their D6 Days awarded at the same level as was available on May 1, 2016 or, alternatively, ABX be absolved of any liability for accrued but unused for D6 Days that were the eventual result of Defendants' unlawful self-help; and

      (b)     Defendants provide a copy of this Court's Order by certified mail to every ABX crewmember at their most current address of record, in order to ameliorate the effects of Defendants' unlawful conduct under the RLA.

(4)     Alternatively, to the extent Defendants' actions constitute a dispute over the interpretation and/or application of Article 13.M of the Agreement, Defendants shall be ordered to mandatory arbitration with the status quo returned throughout the pendency of that arbitration.

(5)     Award damages against Defendants in such amount as may be proven at trial, together

with such other relief as this Court may deem proper, including costs and attorneys' fees.

Dated:  October 31, 2016

Respectfully submitted,

TRIAL ATTORNEY

/s/  Daniel J. Buckley
Daniel J. Buckley
Ohio Bar No. Bar No. 0003772
Vorys Sater Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone:     (513) 723-4002
Facsimile:      (513) 852-7865
E-mail djbuckley@vorys.com


Andrew D. McClintock *(Pro Hac Vice Pending)*
Patricia G. Griffith *(Pro Hac Vice Pending)*
FORD & HARRISON, LLP
271 17th Street NW, Ste. 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3830
Facsimile: (404) 888-3863
Email:  amcclintock@fordharrison.com

Dannie B. Fogleman (*Pro Hac Vice Pending*)
FORD & HARRISON, LLP
1300 19th Street, NW, Suite 300
Washington, DC 20036
Telephone:     (202) 719-2014
Facsimile:      (202) 719-2077

**Attorneys for Plaintiff**
**ABX Air Inc.**

## VERIFICATION OF COMPLAINT

I, Robert Boja, declare that I am the Vice President of Flight Operations for ABX Air, Inc., and that I am authorized to make this verification on its behalf. I have read the foregoing Verified Complaint for Injunctive and Declaratory Relief, and I know the facts stated therein to be true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Robert N. Boja

Sworn and Subscribed to:
before me this 31st day of October, 2016.

_____
Notary Public

My commission expires: 2/28/21

VICKI J ERTEL
Notary Public
State of Ohio
My Commission Expires
February 28, 2021

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 31, 2016, the foregoing was electronically filed

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following:

> John Robert Doll
> Doll, Jansen & Ford
> Suite 1100
> 111 West First Street
> Dayton, OH 45402-1156
> Telephone: 937-461-5310
> Fax:  937-461-7219
> Email:  jdoll@djflawfirm.com
>
> Lynne Nowel
> Airline Professionals Assoc. Teamsters Local 1224
> 2754 Old State Route 73
> Wilmington, OH 45177
> Telephone: 937-655-9585
> Fax: 937-383-0902
> Email:  lnowel@apa1224.org

A copy was served on Mr. Doll by email on the foregoing date.

> /s/  Daniel J. Buckley
> Daniel J. Buckley