**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **ABX AIR, INC.,** | : | |
| | : | **CASE NO. 1:16-CV-1039** |
| Plaintiff, | : | |
| v. | : | **JUDGE BLACK** |
| | : | |
| **INTERNATIONAL BROTHERHOOD** | : | **DEFENDANTS' MEMORANDUM IN** |
| **OF TEAMSTERS, AIRLINE DIVISION,** | : | **OPPOSITION TO PLAINTIFF'S** |
| **et al.,** | : | **MOTION FOR TEMPORARY** |
| | : | **RESTRAINING ORDER AND** |
| Defendants. | : | **PRELIMINARY INJUNCTION** |

---

On October 31, 2016, Plaintiff ABX Air, Inc. ("ABX" or "the Company") filed its Complaint in this matter against the International Brotherhood of Teamsters ("IBT") and its affiliate, the Airline Professionals Association, Teamsters Local 1224 ("Local 1224" or "the Union"), requesting injunctive relief to prevent an alleged strike threat and to halt purported "bans" on Union-represented pilots bidding for voluntary overtime work or voluntarily selling back vacation time, in favor of working instead. As an initial matter, the Defendants categorically deny that the Union has threatened a strike or that it intends to call one at the present time. Therefore, this portion of the Company's action is unsupported and essentially moot.

The Company's remaining claims for injunctive relief – that the Union must be ordered to cease its "bans" on crewmembers voluntarily bidding for overtime referred to as open flying and on the sell-back of vacation – are outside this Court's jurisdiction to consider. First, the questions of whether the crewmembers may decline to bid for open flying time or to sell back their vacation, whether acting individually or in concert, represent minor disputes under the Railway Labor Act that are within the exclusive realm of the contractual and statutory dispute resolution procedures.

Second, the Norris-LaGuardia Act prohibits most injunctions in labor disputes, including the type sought by ABX here. Finally, the evidence will show that the staffing shortages and actual or potential service problems of which the Company complains are the consequence of its own poor decisions and mismanagement, not of the actions of the pilots in exercising their contractual rights. Therefore, the Plaintiff's arguments that the crewmembers are engaged in a job action that has resulted in an interruption of ABX's operations are groundless. Finally, the Company's conduct shows it has unclean hands in this situation and cannot seek equitable relief from this Court.

## STATEMENT OF THE FACTS

The Union and the Company, or their predecessors, have been parties to six collective bargaining agreements since 1983 (not 1992, as stated by ABX in its Memorandum), with the most recent one taking effect on January 1, 2010,[1] and becoming amendable on December 31, 2014. Declaration of Richard Ziebarth, attached hereto, ¶ 3 (hereinafter "Ziebarth Decl."). Contrary to the picture painted in ABX's pleadings of a Union and pilot group who are uncooperative in scheduling and cavalier about the Company's business, a review of the recent bargaining history and mid-term agreements the Union has accepted during the current contract shows that Local 1224 consistently has worked with ABX to help the Company meet its staffing needs – even in the face of what the Union considers to be mismanagement, poor planning or even intentional under-staffing.

The 2009 CBA was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL. The Union agreed among other things to freeze the pilots' pension, so they would no longer accrue years of service and the benefit derived would not incorporate any increase in a crewmember's earnings. Pay rates were cut on average by nearly 16

---

[1] Although it took effect at the very start of 2010, this agreement was negotiated throughout 2009 and generally is referred to by the parties as the 2009 contract.

percent; the crewmembers' contributions to health care premiums increased dramatically; the Company contribution to the crewmembers' 401(k) plan was eliminated and replaced with a new plan that covered only certain crewmembers; and more senior pilots lost a week of vacation. Ziebarth Decl. ¶ 2.

ABX in 2009 also sought additional pilot productivity under Article 13, the scheduling provision. Among other things, the parties agreed to reduce the minimum days off in a bid period, to 13 days off in a 30-day period and 14 days off in a 31-day period, corresponding to a total of 17 days of work in each period. ABX also wanted to avoid having to provide premium pay (above the monthly guaranteed salary) to pilots whose schedules changed for reasons beyond the Company's immediate control. The parties reached a compromise agreement on scheduling issues, including by creating a new type of duty day called a "flex day." Flex days are "placeholder" work days listed in the lines of flying in ABX's Company's monthly bid packets. These dates do not include specific trips, but the bidding pilot is required to take an assignment on those dates if one arises. Declaration of Timothy Jewell ¶ 9 (hereinafter "Jewell Decl.").

Even during the 2009 negotiations, though, the Union was mindful of retaining as much as possible the predictability of the pilots' schedule and protecting their days off. Throughout the parties' six successive collective bargaining agreements, crewmembers' quality of life has been a major priority for the Union in bargaining. Most if not all crewmembers are on duty in the middle of the night for several consecutive days and are away from home while on duty. Crewmembers fly both domestically and internationally, frequently changing time zones. A crewmember's time off is of utmost importance, and protecting it has always been a priority in negotiations. Ziebarth Decl. ¶¶ 4, 5; Jewell Decl. ¶ 10.

Local 1224 also wanted to provide the pilots with greater certainty to know in advance what days off they would have each month, and the Union and the Company eventually revised substantially the emergency assignment provisions of Article 13. The current version of Article 13, Section M.2 of the contract, was changed to provide that pilots "shall only be given emergency replacement assignments on six (6) days per Calendar Year except as provided in Section M.5., of this Article." Section M.5 provides that, for each day of emergency assignment after the first six, the pilot is to be granted a day off at a later date in the current or subsequent bid month. These replacement days off are referred to as "D6" days. In addition, Section M.5 provides: "The selected Work Day(s) that are dropped due to the provisions of this Section shall be at the discretion of the Crewmember." However, these restored days off are not considered "inviolate" days. A pilot may be compensated financially in lieu of a make-up day off, but only if he or she does not have enough work days in the applicable bid period to cover it. Otherwise, "[t]he Company shall not offer and the Crewmember shall not accept pay in lieu of a getting a Day(s) Off restored." Ziebarth Decl. ¶ 9; Jewell Decl. ¶ 13.

The parties also agreed in the 2009 contract to change certain provisions relating to open flying assignments, including permitting ABX to assign the trips to reserve pilots who would be paid at straight time instead of to regular lineholders who would be paid a premium, an important cost-savings mechanism. In partial exchange for these additional productivity and financial concessions, the Company also expressly agreed that crewmembers are "not required to bid on any open flying." Jewell Decl. ¶ 10.

The parties began negotiations to amend the 2009 CBA in late December 2013 or early January 2014. In January 2014, the Company informed the Union that it would furlough 12 pilots, all in the First Officer position, effective February 2, 2014. After reviewing the Company's staffing

levels, the Union pointed out that ABX did not have enough Captains and that it was properly staffed in the First Officer position without the furloughs. After several meetings the Company and the Union entered into a Letter of Agreement ("LOA") that required ABX to upgrade five First Officers to the Captain position and provided that those Captains would be dual-qualified for both seat positions – that is, ABX could assign them to serve in the First Officer position at the Captain rate of pay. Additionally, to address the Company's concerns over an increase in the costs of vacation buy-back, the parties agreed that ABX could restrict vacation buy-back to no more than two weeks per employee during the term of the Letter of Agreement, which expired no later than December 31, 2014. Ziebarth Decl. ¶ 6 & Ex. A thereto. Throughout this time, the Union and the Company were engaged in RLA Section 6 negotiations to amend their 2009 CBA. The parties' negotiations and resulting letter of agreement regarding crewmember furloughs and vacation buy-backs were separate and apart from the RLA Section 6 negotiations.

On March 4, 2015 the Company issued furlough and surplus notices to certain crewmembers, to be effective on April 4, 2015. The Union again reviewed the Company's staffing and pointed out that the staffing level already was actually too low for the flying that needed to be accomplished. After additional meetings, ABX and Local 1224 entered into another Letter of Agreement dated March 17, 2015, in which the Company agreed to rescind the furlough and surplus notices. In exchange, the Union gave the Company the discretion to deny crewmembers the option to sell back vacation during the month of May 2015. As had been the case in 2014, the discussions that result in this LOA took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA. A copy of this LOA is attached to Ziebarth Declaration as Exhibit B. Ziebarth Decl. ¶ 7.

By April 2015, Captain Ziebarth began to receive complaints from ABX pilots about an increase in emergency assignments, also known as junior manning, to flights on their days off under Article 13, Section M of the contract. Captain Ziebarth discussed the issue with the Company and learned there had been a larger than expected number of open flights for which pilots were needed, for several reasons. Five crewmembers had resigned, an expected operational change to remove flights to three cities was delayed, the Company was continuing flights to Europe for a customer known as TNT longer than expected and another route, to GITMO, had been continued for an unspecified period of time. Ziebarth Decl. ¶ 8. Under these rather unique circumstances, the Union took no action at that time.

In June 2015, Captain Ziebarth received a report from the Union Stewards that many crewmembers had reached or exceeded six days of emergency assignments in the calendar year already. The Union published a notice to the pilots advising them of the language in the Agreement regarding emergency assignments and D6 days. Ziebarth Decl. ¶ 9 & Ex. C thereto.

In August 2015, Captain Ziebarth initiated discussions with ABX, urging it to recall furloughed crewmembers and reminding management of an earlier Memorandum of Understanding, signed in April 2012, which provided that the Company would recall 14 furloughed pilots which it had failed to do. However, management refused, explaining they did not want to bring back crewmembers at the 12-year pay rate that would apply based on the furloughed employees' years of service. Instead, ABX wanted to wait until the recall rights for all furloughed crewmembers were to expire – and until those pilots thus would drop off the seniority list – in February 2016. ABX could then hire new crewmembers at much lower entry-level pay rates. Also in August 2015 Captain Ziebarth reported to the crewmembers that a substantial number of them had reached the limit of six emergency assignments, with four months remaining in the year

including the busiest quarter. The pilots were advised of the provisions regarding emergency assignments. Ziebarth Decl. ¶ 10.

While crewmembers continued to accumulate D6 days and emergency assignments continued to be made, the Company approached the Union in August 2015, again proposing relief from its obligations under the Agreement with respect to emergency assignments. The parties agreed to a temporary Voluntary Emergency Assignment program, under which crewmembers could voluntarily bid for emergency assignments and be paid the applicable premium pay but not accrue D6 days. The parties also agreed to a Voluntary Reassignment Program that would not cause crewmembers who were issued emergency reassignments while on layover to accrue D6 days. Both of these programs applied only to the fourth quarter of 2015. Finally, the Company agreed to recall six furloughed crewmembers to begin training in January 2016; these agreements were incorporated into a Memorandum of Understanding dated September 1, 2015. Once again, the discussions that led to this agreement between the parties took place separate and apart from the RLA Section 6 negotiations to amend the 2009 CBA. Ziebarth Decl. ¶ 11 & Ex. D thereto.

    On October 19, 2015, the Union notified the pilots that the Company might begin issuing advance emergency assignments and reviewed the details in the Agreement regarding advance emergency assignments. In January 2016 Mr. Ziebarth reminded crewmembers to schedule any D6 days they had accumulated. The Company was continuing to emergency assign crewmembers in January 2016. Ziebarth Decl. ¶¶ 12, 13. In February 2016, ABX agreed to recall eight additional crewmembers from furlough and hold in abeyance the removal of furloughed Crewmembers while the recall process was underway. Id. ¶ 14.

    In March 2016, ABX reported that its parent company, Air Transport Services Group ("ATSG"), had entered into an agreement with Amazon to perform cargo operations in the U.S. and

that ABX would be performing at least a portion of the flying. The Company also advised the Union it was going to begin the hiring process. Ziebarth Decl. ¶ 15.

During the first half of 2016, pilots continued to be emergency assigned to trips. By the end of June 2016, 59 percent of Captains and 48 percent of First Officers had reached or exceeded the six-day limit on emergency assignments. Captain Ziebarth, who is the third most senior of about 114 Captains, had reached that limit in March, less than three full months into the year. Captain Ziebarth received numerous complaints from crewmembers about the lack of time off and advised them to refrain from bidding open flying, avoid answering their phones, schedule their D6 days and take other measures to enhance their chances of having some days off. Ziebarth Decl. ¶ 16.

Beginning in August 2016, representatives of ABX requested that Captain Ziebarth and fellow Union officer Captain Timothy Jewell meet with them to discuss granting the Company relief yet again from its obligations under the Agreement with respect to D6 days and emergency assignments. They met several times in August and September and, like the prior meetings over the last two years in which the Company sought temporary relief from its CBA obligations, the meetings all took place separately from the parties' RLA Section 6 negotiations to amend the 2009 CBA.

The Local 1224 representatives told the Company that, while they were willing to consider once again granting ABX some relief from its obligations under the 2009 CBA regarding emergency days off and D6 restoration days off, the Union also wanted to discuss issues that were important to the crewmembers. These included job preservation and what the Union saw as the Company's longstanding tactic of playing the ABX and ATI pilot groups off one another in

order to secure concessions from each.[2] The Company declined to do so and stated its view that those issues were better addressed through the parties' RLA Section 6 negotiations to amend the 2009 CBA. Nonetheless, ABX still wanted relief from the scheduling provisions of the contract. Ziebarth Decl. ¶ 17. However, no mid-term agreement to modify the contract was reached this time.

Neither Local 1224 nor any of the individual officers have been actively encouraging the pilots to refrain from bidding open time or from buying back vacation, since June 2016 or otherwise, as the Company alleges in this case. The members of the Union Negotiating Committee have decided not to do so and have communicated that to the members. However, there is no "ban" or any other requirement that the Union members "march in lockstep" with the Union leadership on these points. Ziebarth Decl. ¶ 21.

Not only did Local 1224 not instruct pilots not to refuse any assignments, on October 31, 2016, the Union provided guidance to the members about the use of D6 days. Specifically, the Union informed them of their right to take a replacement day off for each day of emergency assignment after the sixth one and told the pilots to point this out to the Crew Scheduling staff. However, the Union also advised the pilots that, if crew scheduling refused to grant any pilot a D6

---

[2] ABX also claims in this case that the Union Defendants are attempting to apply leverage to induce it to merge its operations with ATI, a sister carrier owned by joint parent ATSG. See Complaint (Doc. 1) ¶¶ 32-41. The Company concedes, however, that the IBT properly petitioned the National Mediation Board to resolve whether the operational and managerial integration of ABX and ATI are such that they should be recognized as a single transportation system for labor relations purposes. Id. ¶ 103. The Company's motion attempts to cast this representation dispute as a contract interpretation matter and thus to impede the NMB's investigation. It must not be allowed to do so.

"Under Section 2, Ninth of the Railway Labor Act, the National Mediation Board has exclusive jurisdiction over representation disputes." Western Airlines, Inc. v. International Bhd. of Teamsters, 480 U.S. 1301, 1302-03 (1987). This is true even if the representation dispute has arisen during the collective bargaining process because "disputes as to the effect of collective-bargaining agreements on representation in an airline merger situation are representation disputes with the exclusive jurisdiction of the National Mediation Board." Id. at 1305-06, citing Air Line Employees v. Republic Airlines, Inc., 798 F.2d 967, 968 (7th Cir. 1986; see also Independent Union of Flight Attendants v. Pan Am. World Airways, Inc., 836 F.2d 130, 131 (2nd Cir 1988)(holding that "the issue of whether the … employees may bargain as a unit or are to be represented by the larger unit is a paradigmatic representation issue subject to resolution by the National Mediation Board" and affirming its district court's holding that "a decision on [] contract issues [that] will necessarily implicate representational concerns" are matters within the NMB's exclusive jurisdiction. Independent Union of Flight Attendants v. Pan Am. World Airways, Inc., 664 F. Supp. 156, 158-59 (S.D.N.Y. 1987)).

day, he or she should inform the scheduler that this would result in the accrual of one more replacement day off. Ziebarth Decl. ¶ 25 & Ex. E thereto.

As Captain Ziebarth's affidavit makes clear, the pilots are simply exhausted from the amount of additional flying time ABX has been requiring in 2016. The Union's records indicate that, from January 1 to October 25, 2016, the Company emergency assigned the approximately 200 bargaining-unit pilots on 7,094 days. This level of extra work, particularly when it can be assigned on relatively short notice, is not only tiring but also greatly disrupts the personal and family lives of the crewmembers, who fly domestically and internationally and who generally do not live near the Company's Cincinnati domicile for purposes of reporting to work. Understandably, the crewmembers are also frustrated that ABX is forcing them to work this overtime, rather than making reasonable staffing plans. Therefore, it is reasonable that they are deciding not to voluntarily bid for extra work or to sell back their vacation[3] for these perfectly valid reasons. Ziebarth Decl. ¶ 22.

The Company has now unilaterally changed the application of D6 restoration days off, claiming that the pilots do not have an unrestricted right to schedule those days despite the clear contract language. The Company is also not making sufficient vacation weeks available for the crewmembers, refusing to schedule their vacation time and attempting to force them to sell it back. Both of these unilateral changes, in the Union's opinion, violate the status quo. Ziebarth Decl. ¶ 22.

Most significantly, neither Captain Ziebarth nor any other Union representative threatened a strike or work stoppage of any kind on October 28, 2016, or at any time this year. Captain Ziebarth also denies categorically that he said, as the Company alleges, that the Union "will shut them down"

---

[3] It is ironic, and telling, that ABX is now demanding that pilots resume selling back their vacation, when in both 2014 and 2015 it requested and obtained from Local 1224 temporary restrictions on such vacation buy-backs because of the cost. Essentially, ABX wants to be able to either rely upon or change the contract provisions as it may suit the Company's own purposes, but it does not acknowledge the rights of the crewmembers to rely upon and use those very same provisions.

on November 1, 2016. The Union does not intend to strike at this time, and it certainly did not "set a strike date of November 2, 2016," as ABX alleges. Mr. Ziebarth did state to the Company's Vice President of Operations, Robert Boja, that ABX's current staffing levels and procedures were going to result in a meltdown, since it was not adequately staffed and since the emergency assignments and D6 days were snowballing. However, the snowballing effect had begun to occur very early in the year, long before any crewmembers began to decline bidding for open flying. The Company's current scheduling problems, including the increased costs of covering its flights and the lack of available crewmembers, are entirely of its own making. Ziebarth Decl. ¶ 23.

## ARGUMENT

### This matter is outside the Court's jurisdiction.

This Court lacks jurisdiction over the Plaintiff's claims for two reasons. First, this matter represents a "minor dispute" under the Railway Labor Act that may not be adjudicated by the Courts but, rather, must be addressed through the statutory and contractual dispute resolution procedures, including binding arbitration before the System Board of Arbitration. Second, even if the Court determines that the present action constitutes a RLA major dispute over which it may assert jurisdiction, the Norris LaGuardia Act nevertheless would require that the Court deny the Plaintiff's request for injunctive relief.

#### The "Minor Dispute" and "Major Dispute" Distinction

This Court lacks subject matter jurisdiction under the Railway Labor Act to entertain Plaintiff's Complaint and Plaintiff's Motion for Preliminary Injunction. Based solely on the allegations in the Plaintiff's Complaint, it can be easily determined that ABX has failed to exhaust the contractual grievance procedures as mandated by Section 204 of the RLA, 45 U.S.C. § 184, which requires both parties to a collective bargaining agreement to submit disputes over the

interpretation and/or application of the collective bargaining agreement to the appropriate Adjustment Board created by the parties. If the Company believes the pilots or the Union are violating any provision of the collective bargaining agreement by not bidding open flying, it has a statutory obligation to bring that matter to the agreed-upon procedures to resolve what are considered minor disputes as required by Section 2, Sixth and Section 184 of the RLA, 45 U.S.C. § 152, Sixth and § 184.

The Supreme Court in Elgin, Joliet and Eastern Railway Co. v. Burley, 325 U.S. 711, 722-24 (1945), defined the two type of disputes under the Railway Labor Act as either "major disputes" or "minor disputes." The Court explained that a "major dispute:"

> relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

Burley, 325 U.S. at 723. By contrast, a "minor dispute:"

> contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event, the claim is founded upon some incidents of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case, the claim is to rights accrued, not merely to have new ones created for the future.

Burley, 325 U.S. at 723. For a major dispute, the RLA mandates a "virtually endless" process of negotiation and mediation before a party can resort to self-help. Burlington Northern v. Maintenance of Way Employees, 481 U.S. 429, 444 (1987). See generally 45 U.S.C. §§ 155 and 156; see also Airline Professionals Ass'n, Local 1224 v. ABX Air ("Search Policy Case"), 274 F.3d 1023, 1027-29 (6th Cir. 2001).

In regard to minor disputes, the RLA mandates compulsory and binding arbitration before an adjustment board established through collective bargaining. 45 U.S.C. §§ 153 & 184. The adjustment board has exclusive jurisdiction over minor disputes; federal courts do not have jurisdiction to adjudicate them. Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n (Conrail), 491 U.S. 299, 303 (1989).

In Conrail, the Supreme Court set an explicit standard for differentiating between major and minor disputes. Relying on various phrases used by the circuit courts, the Supreme Court explained the following test for differentiating between a major and minor dispute:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

491 U.S. at 307. See also National Ry. Labor Conf. v. International Assn. of Machinists, 830 F.2d 741, 746 (7th Cir. 1987); Maine Central R. Co. v. United Transp. Union, 787 F.2d 780, 782 (1st Cir.), cert. denied, 479 U.S. 848 (1986); International Bhd. of Elec. Workers v. Washington Terminal Co., 473 F.2d 1156, 1173 (D.C. Cir. 1972).

In Conrail, the company unilaterally added drug testing to physical examinations of its employees. The union filed suit against the company challenging this unilateral change in working conditions. The parties agreed that this matter was a dispute under the RLA, but disagreed on whether it was a minor or major dispute. The Supreme Court reversed the Third Circuit and, in agreement with the District Court, determined that the issue involved a minor dispute subject to the exclusive jurisdiction of the adjustment board contained in the collective bargaining agreement, as the carrier's action was at least arguably justified by the contract language and the parties' past practice. 491 U.S. at 311.

Where one party "asserts a contractual right to take the contested action, the ensuing dispute

is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement." Conrail, 491 U.S. at 307. The Court in Conrail noted that the carrier's burden in establishing that its action is "arguably justified" is "relatively light." Id. at 307, 320. Applying this light burden, a court's only duty is to determine whether the claim or the proffered interpretation of the contract is "frivolous" or "obviously insubstantial." Id. at 318-19. The District Court should not assess the relative merits of the parties' competing interpretations of the contract or decide who has the better of the argument. See, e.g., Railway Labor Execs.' Ass'n. v. Chesapeake, W. Ry., 915 F.2d 116, 119 (4th Cir. 1990); Maine Cent. R.R. Co. vs. United Transp. Union, 787 F.2d 780, 782 (1st Cir. 1986).

Given the relative posture of an employer and a union, most of the reported cases dealing with unilateral changes and the major/minor dispute distinction involve actions or interpretations unilaterally implemented by the carrier. However, the same principles certainly should apply to actions by the employees or the union – the test is whether the position taken is arguably justified under the terms of the collective bargaining agreement. In this case, the actions of the Union and the pilots in simply declining to take voluntary actions that are optional to each individual under the collective bargaining agreement clearly are arguably justified by the contract, and the Union's position is not so frivolous or obviously insubstantial that this rises to the level of a major dispute.

It is true that ABX and Local 1224 happen to be, and have been for some time, engaged in negotiations for an amended collective bargaining agreement under Section 6 of the RLA. However, not every dispute that arises during the course of RLA Section 6 negotiations is a major dispute. See, e.g., Airline Professionals Ass'n, Teamsters Local 1224 v. ABX Air, Inc. ("Russell"), 400

F.3d 411, 415 (6th Cir. 2005); <u>Air Line Pilots Ass'n v. Eastern Airlines, Inc.</u>, 863 F.2d 891, 899

(D.C. Cir. 1998).

In the <u>Russell</u> case, one of several prior cases in this Court and the Sixth Circuit between

ABX and Local 1224, the parties were in the opposite positions as in the current litigation. Local

1224 had sought injunctive relief over what it considered to be a change in the terms and

conditions of employment for flight crewmembers, after the Company demanded that a pilot

undergo an independent medical examination before returning from a disability leave, despite a

release from his personal physician. ABX asserted that this Court did not have jurisdiction over

the matter because it was a minor dispute under the RLA. This Court granted summary judgment

to the Union, but the Sixth Circuit overturned that decision.

The appellate court, following the lead of the D.C. Circuit in the <u>Eastern Airlines</u> case,

specifically held that not "every dispute arising under a CBA that is being renegotiated is a major

dispute." 400 F.3d at 415. The Eighth Circuit in a 1991 case reviewed the applicable case law

and reached the same conclusion.

> The Carmen's argument simply overlooks the vast number of cases that have
> addressed this precise point. Several circuits, including this one, have held that the
> service of a section 6 notice by the union does not transform a minor dispute into
> a major one. *See Sheet Metal Workers,* 893 F.2d at 204. *See also Air Line Pilots
> Ass'n Int'l v. Eastern Air Lines, Inc.,* 863 F.2d 891, 900 (D.C. Cir. 1988); *CSX,*
> 879 F.2d at 1000 (once a dispute is found to be minor, the service of section 6
> notices "would have no transforming or alchemizing effect upon that situation");
> *Railway Labor Executives Ass'n v. Chesapeake W. Ry.,* 915 F.2d 116, 120 (4th
> Cir. 1990) *cert. denied,* 499 U.S. 921, 111 S.Ct. 1312, 113 L.Ed. 2d 246 (1991).
> *Chicago & N.W. Transp. Co. v. Railway Labor Executives Ass'n,* 908 F.2d 144,
> 151 (7th Cir. 1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed. 2d
> 1179 (1991). As the District of Columbia Circuit correctly pointed out, allowing a
> party "to characterize all disputes as 'major' through a unilateral action such as
> serving § 6 notices on the other party is unwise and contrary to the two-track
> procedure of the [Railway Labor Act]." *Air Line Pilots Ass'n,* 863 F.2d at 900.

<u>Brotherhood of Ry. Carmen, Div. of Transp. Comm'ns Union v. Missouri Pac. R. Co.</u>, 944 F.2d

1422, 1427–28 (8th Cir. 1991).

ABX as the Plaintiff here is quite familiar with the major-minor dispute paradigm. In several cases in which Local 1224 sought to enjoin various Company actions that it believed violated the RLA's status-quo requirements, in addition to the Russell case, ABX asserted in defending against the claims that the matters involved minor disputes under the RLA that could only be addressed through the contractual processes, not by the courts. See, e.g., Airline Prof'ls Ass'n, Teamsters Local 1224 v. ABX Air, Inc. ("Osaka Domicile Case"), 2007 WL 4460619 *4-5, S.D. Ohio Dec. 14, 2007; Airline Prof'ls Ass'n, Teamsters Local 1224 v. ABX Air, Inc. ("CVR Case"), 2001 WL 1609934 *4-5, S.D. Ohio Dec. 13, 2001; Local 1224 v. ABX Air (Search Policy Case), 274 F.3d at 1027-29. It appears that ABX's stance is that any positions it takes about the interpretation of the collective bargaining agreement and any unilateral changes it makes are "arguably justified" and thus minor disputes – but that any such positions or actions by the Union under the contract are not arguably justified and must represent a major dispute that permits the Company to seek injunctive relief. This one-sided view of the RLA should not be permitted.

It is also notable that in two of these cases, involving the Osaka Domicile and the Search Policy, the parties were engaged in bargaining to amend their existing contract; indeed, in the Osaka Domicile case the Union had specifically served a separate Section 6 notice upon ABX Air to negotiate on that matter. Nonetheless, this Court and the Sixth Circuit concluded that the unilateral changes by the Company that were at issue were minor disputes under the RLA.

In this case, although the dispute has arisen while the parties are engaged in Section 6 negotiations to amend their CBA, it involves efforts by the Company to secure immediate relief from already vested, *existing* contractual obligations that it willingly assumed in prior negotiations and to demand that the Union and crewmembers modify or decline to exercise existing rights under the current contract. This is not, therefore, a major dispute "over the

formation of collective agreements or efforts to secure them." To the contrary, there is in existence "a collective agreement already concluded," and the dispute relates "to the meaning or proper application of a particular provision with reference to a specific situation." <u>Burley</u>, 325 U.S. at 723. This is the very definition of a minor dispute under the RLA. This Court simply does not have subject matter jurisdiction to entertain an action to enjoin conduct which constitutes a minor dispute under the RLA.

As it has done *three times* before – all during the current, ongoing negotiations but separately from them – ABX approached Local 1224 and sought mid-term contractual relief from its scheduling obligations and staffing shortfalls. Each time, the Union accommodated the Company and agreed to temporary changes in the contractual procedures and rules. <u>See</u> Ziebarth Decl. ¶¶ 6, 7 & 11 & Exs. A, B & D thereto. However, the Local concluded that it had obtained little if any consideration from ABX for making these temporary modifications to the contract and to the Company's obligations to the crewmembers. Therefore, this time the Union and pilots have not acceded to ABX's request for yet another short-term agreement to provide the Company mid-term contractual relief and the pilots have exercised their contractual right not to bid for open time flying. Many also have declined to sell back their vacation time and work instead – perhaps because they already are required to work on their days off. The Union and the pilots are well within their rights not to grant mid-term contractual relief to the Company, and the exercise of those rights during ongoing RLA Section 6 negotiations to amend the CBA for the next contract cycle/term does not trigger a RLA major dispute over which this Court may exercise jurisdiction.

Indeed, the Sixth Circuit in a similar case filed by ABX some 15 years ago concluded that the actions of the Union and the crewmembers in making decisions not to bid on voluntary open

flying was not a strike or an interruption of operations, even though the actions cost the Company substantial amounts in premium pay and caused it to forego bidding for certain customer contracts. As the appeals court held in that case:

> [T]he dispute between ABX and the Union is a minor one, during which there is no requirement to maintain the status quo, thus making certain types of concerted action available that would not be during a major dispute. Indeed, we cannot find any case in which a union was held to have violated the RLA during a minor dispute by encouraging its members to refrain from engaging in conduct that is voluntary under a CBA

ABX Air, Inc. v. Airline Professionals Ass'n, Teamsters Local 1224 ("Open Flying I"), 266 F.3d 392, 398 (6th Cir. 2001).

That is exactly the case here. There has been no refusal to work overtime (open flying) by any of the pilots who have decided not to bid open flying. The ABX pilots continue to work extra days or hours when that overtime is assigned to them through the emergency assignment process, just as they have in the past when overtime has been assigned to them. All they have done is decline to bid voluntarily for open flying trips. The contract gives each pilot the individual, unfettered choice of whether to bid on open flying time or not.

Furthermore, the contract also provides the pilots with the right to select, without restrictions, a D6 replacement day off for every day they are emergency-assigned after the sixth time in a calendar year. Finally, although the CBA offers those who wish to work in lieu of taking their vacation time the opportunity to sell their time back to the Company, there is nothing that requires the pilots to do so. Crewmembers may choose to sell back their vacation time or use it, at their option. Currently, it seems likely that many are choosing to use their vacation time, since ABX's short staffing has resulted in the existing pilots frequently being emergency-assigned to work on their scheduled days off.

ABX asserts that the present situation is different from the earlier case when the Sixth Circuit found that even a concerted refusal to volunteer for open flying was not a strike, because it alleges that today the "snowball" effect of the lack of open flying volunteers and the provisions of D6 requiring replacement days off – a provision not in the contract in 2001 – have in fact interrupted its operations. ABX claims it has had to cancel or delay flights and even cancelled one customer contract because of "scheduling shortages resulting from Defendants' ban on voluntary overtime." Plaintiff's Memorandum (Doc. 2) at 7.

The fault in this argument is that it is the Company's own actions, and inaction, that have led to the current, allegedly critical situation. The staffing shortage, with the attendant expense and service failures, is the product not of any conduct by ABX employees but of management's refusal to adequately staff its operations for at least the last year and a half. Beginning in the summer of 2015, ABX insisted that its operations were adequately staffed with pilots and on several occasions informed the Union intended to furlough additional pilots. The Union repeatedly questioned the Company's staffing assumptions and pointed out that its bare-bone staffing model based on alternative staffing and overtime options consisting of voluntary open flying and involuntary emergency assignments ultimately would cause long-term, significant and ever-cascading staffing problems. Local 1224 urged the Company to mitigate the staffing deficit by recalling ABX pilots who still had contractual recall rights after having been furloughed in 2008 and 2009. Management refused to recall furloughed ABX pilots, apparently preferring to let the furloughed pilots fall off the seniority list rather than recall them and pay them at scales based on their years of service, as required by the CBA's recall provisions, and instead hire new pilots who would start off at the significantly lower first-year pay and benefit scales. Ziebarth Decl. ¶ 10.

In one of its concessions to help ABX cover its work, the Union on September 1, 2015, entered into a memorandum of understanding with the Company in which ABX agreed to recall some, but far from all, of the furloughed pilots. In exchange, Local 1224 and the pilots provided mid-term contractual relief from the Company's scheduling obligations by adopting a voluntary emergency assignment procedure that allowed ABX to avoid having to credit participating pilots with accumulating D6 restoration days off during the fourth quarter of 2015. Ziebarth Decl. ¶ & Ex. D thereto.

Despite the Union's and pilots' efforts to accommodate the Company and alleviate its obvious staffing deficit in the busy fourth quarter of 2015, ABX still imposed a significant number of emergency assignments through 2016 and, thus, continued to incur the obligation to provide D6 restoration days off. ABX apparently did not plan for that contingency, however, and as a result, it immediately fell into a deeper staffing and scheduling deficit in 2016. Because it had refused to recall a sufficient number of the furloughed ABX pilots and waited to hire new, lower-paid pilots until after the date in early 2016 when many of the expensive furloughed pilots had fallen off the seniority list, the Company's scheduling difficulties increased throughout 2016 as it continued to force pilots to work emergency assignments on their days off. By the end of the first quarter of 2016, approximately 40 percent of ABX captains and 33 percent of its first officers had already been forced to fly the contractually allowed emergency assignments. Captain Ziebarth, one of the most senior ABX crewmembers, reached the six-day limit in early March. Ziebarth Decl. ¶ 16.

Having repeatedly accommodated the Company by granting it relief from its scheduling obligations under the CBA, while in the Union's view receiving little or no consideration in return, the Union and a weary pilot group advised ABX that they were not willing to provide

additional interim relief to management under the existing contract without consideration for it. In response, the Company unilaterally changed the pilots' working conditions by refusing to allow the pilots to select replacement days off without restriction or interference – unilaterally imposing a condition that management had failed to win at the bargaining table and violating the status quo.

ABX is now attempting to mischaracterize the Union's and pilots' position of simply holding to their contractual rights; instead, the Company asserts that the Defendants are engaged in a major dispute. (At the same time, ABX claims its own actions – that actually are in direct contradiction to clear contract provisions – are arguably justified by the contract and are a minor dispute.) The Company essentially seeks judicial relief from the contract's staffing and scheduling protections, even though it willingly agreed to include them in prior negotiations, and from its own mismanagement.

The Company's failure to adequately staff its operations over at least the last several years is seen through a close look at the changes in ABX staffing levels from September 2015 to September 2016. The Company had 185 active, bidding crewmembers on the rolls at the end of September 2015, but that number *decreased* to 178 by the end of January 2016. That was the fewest active pilots at ABX since August, 2015, when there were 175, and the second lowest number on its rolls in more than six years. Ziebarth Decl. ¶ 18. That reduction in the number of active crewmembers available to fly each month contributed greatly to the Company's need for mid-term contractual relief from its scheduling obligations under the current CBA to cover its 2015 fourth-quarter peak season flying, as discussed above. During that same period, though, ABX refused to recall the remaining furloughed ABX pilots, in an apparent attempt to save money later by being able to use lower-paid new hires in the future.

After the furloughed pilots' recall period ended, the Company did begin hiring pilots, but by the end of April, 2016, the number of bidding pilots on its rolls still was only 188, an increase of just 13 pilots since the beginning of the year and only three more than in September. The Company failed to take action in early 2016 to recall former pilots or to aggressively increase hiring, despite the fact that in March 2016 it had entered into a large contract with Amazon that required significantly increased aircraft operations beginning later in 2016 and the expansion of the Company's fleet of wide-body aircraft by the end of 2017. ABX accepted this customer contract during a period in which there is a greatly publicized and steadily increasing, worldwide shortage of qualified pilots. Ziebarth Decl. ¶ 19.

Despite increasing its business and its flight schedule over the last several months as it brought more aircraft on line to meet its obligations to its customers, the Company only increased its total active pilot headcount to 198 by the end of September 2016. There remains an enormous disparity between the minimal rise in staffing levels and the enormous increase in needed flying hours to fulfill the schedule the Company needs to meet its additional service obligations to its customers. Ziebarth Decl. ¶ 20.

It is clear that the current difficulties ABX faces are the result of its own refusal to increase its staffing, including by waiting to hire new pilots until after the remaining furloughed ABX pilots fell off the seniority list, and not by the existing, overworked crewmembers deciding not to volunteer for extra work, through open flying or vacation sell-back, or by the Union refusing to alter yet again the contractually agreed provisions for D6 restoration days off. The Company should not be given a judicial bail-out to rescue it from the perfectly foreseeable consequences of the contract provisions that it voluntarily agreed to in 2009 and from its own short-sighted management decisions. Therefore, while it may be true that the current situation is

more costly to ABX than the prior open flying dispute, the responsibility for that lies squarely with the Company.

The pilots' actions in simply exercising their rights specifically provided for in the contract certainly are at least "arguably" justified by the provisions of the collective bargaining agreement, and this is therefore a minor dispute under the RLA.[4] If ABX somehow believes that it is a contract violation for the pilots to take advantage of the provisions that the Company willingly agreed to and placed in the CBA, its only remedy is through the grievance procedure and the mechanisms of the System Board.

### The Norris-LaGuardia Act bars the granting of injunctive relief in this case.

Since the enactment of the Norris-LaGuardia Act (NLGA) in 1932, federal courts have been precluded from issuing injunctions in cases "involving or growing out of … labor dispute[s]." NLGA, Section 1, 29 U.S.C. § 101. Moreover, Norris-LaGuardia Section 4 specifically forbids injunctions that would prohibit "[c]easing or refusing to perform any work or

---

[4] Indeed, the only potentially "major dispute" related to the present action is one that is not yet before the Court – and it involves the actions by *the Company* to make unilateral changes in terms and conditions, not any action by the Union or pilots. In recent weeks, the Company has unilaterally changed the application of D6 restoration days off, claiming that the pilots do not have an unrestricted right to schedule those days despite the clear contract language giving them the discretion to do so, and refusing to allow them to select their replacement days off. The Company also is not making sufficient vacation weeks available for the crewmembers, refusing to schedule their vacation time and attempting to force them to sell it back. These changes were made unilaterally and without justification under the CBA and, in the Union's view, violate the status quo requirements of the RLA.

The Company's actions in changing clear and unequivocal scheduling and staffing protections specifically afforded to the pilots under the parties' contract may constitute a major dispute. However, the issue of whether ABX's conduct constitutes a violation of the RLA's status quo requirements is not before the Court at this time, as the Union has sought to remedy the Company's actions through direct discussions with the Company before taking any other action.

The Union may conclude at some future date that the Company's refusal to date to address and resolve those matters does constitute a RLA major dispute involving the Company's violation of its RLA status quo obligations. If it does, the Union will, at that time, take appropriate steps to remedy the situation, which may include litigation seeking injunctive relief or perhaps even a strike to restore the status quo. "It has been held that if the [carrier] violates the status quo during a major dispute by altering the pay, rules or working conditions, the union may strike immediately before exhausting the conciliation steps." CSX Transportation, Inc. v. Marquar, 980 F.2d 359, 361, n.2 (6th Cir. 1992), *citing* Detroit & T.S.L.R. v. United Transportation Union, 396 U.S. 142, 154 (1969). However, at this time there is no live, ripe controversy before the Court that would vest it with jurisdiction.

to remain in any relation of employment." Id. § 104(a). A refusal to work overtime hours is employee activity within the protection of § 4(a).  See Teledyne Wisconsin Motor v. UAW, 386 F. Supp. 1231, 1234 (E.D. Wis. 1975), aff'd, 530 F.2d 727 (7th Cir. 1976).

NLGA Section 7 sets forth jurisdictional elements that, if not met, preclude a District Court from issuing an injunction. UAW v. LaSalle Machine Tool, Inc., 696 F.2d 452, 458 (6th Cir. 1982). Section 7 provides:

> No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect –
>
> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained; (b) That substantial and irreparable injury to complainant's property will follow; (c) that as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief; (d) That complainant has no adequate remedy at law; and (d) that the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.

In this case, the Plaintiff has not alleged and cannot prove that the requirements of NLGA Section 7 have been satisfied. First, ABX does not allege and cannot prove any unlawful acts have been alleged or proven. The pilots' choices not to bid voluntary open time or sell back their vacation time and their actions in utilizing their contractual rights to replacement days off after they are emergency-assigned are simply not unlawful acts.  See ABX Air (Open Flying I), 266 F.3d at 398.

Second, there is and will be no substantial and irreparable harm to the Company's property. In addition, the Company has not alleged and cannot prove that the public officers

charged with the duty to protect its property are unable or unwilling to furnish adequate protection. See Cimarron Coal Corp. v. United Mine Workers, 416 F.2d 844 (6th Cir. 1969)(vacating lower court injunction because NLGA Section 7(e) requirement not satisfied); Green v. Obergfell, 121 F.2d 42, 53-5 (D.C. Cir. 1941);Amalgamated Local 813, Allied Ind. Workers v. Diebold, Inc., 605 F. Supp. 32, 34, n.4, (N.D. Ohio 1984). In the Diebold case, the Court noted that Section 7(e) findings are required only in strike cases. In this case, the Plaintiff ABX is seeking an injunction to prevent the Union's "imminent strike" and "self-help." While the Union denies that it has threatened or plans a strike or that it otherwise is engaged in self-help, even if it had it is clear that the Company cannot satisfy the minimum thresholds of NLGA Section 7(e).

Next, the balance of the harms weighs against ABX here. If the Company secures an injunction, it will have obtained – through judicial means and outside the negotiations and dispute resolution processes of the RLA – mid-term relief from its contractual obligations. At the same time, the Union-represented pilots will be deprived of a significant right that they negotiated into their collective bargaining agreement, a violation for which no remedy will be available. An individual crewmember cannot ever get back a day he or she has been forced to work in violation of the contract, and by the time any even partial and inadequate relief could be obtained through arbitration, the peak season involving most such extra work would be long over. Granting ABX the relief it seeks, and thus forcing pilots to bid on what is intended to be *voluntary* open flying and to fly on their scheduled days off and to sell back their vacation, violates the contract and the RLA and would be repugnant to and contrary to public policy. See NLGA Sections 2 & 3, 29 U.S.C. §§ 102 & 103.

In addition, Norris-La-Guardia contains in Section 8 what amounts to a "clean-hands" provision. It provides that no restraining order or injunctive relief shall be granted to "any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. A party that has not made every reasonable effort under the statute prior to seeking injunctive relief has not complied with the NLGA's clean hands requirement. Brotherhood of RR Trainmen v. Toledo P. & W. RR, 321 U.S. 50, 60 (1944). Where an employer does not make every reasonable effort to settle the dispute under the RLA with its employees and union, a District Court's granting of an injunction is inappropriate. Aircraft Service Int'l. v. International Bhd. of Teamsters, 779 F.3d 1069, 1077-79 (9th Cir. 2015).

In this case, ABX has not proceeded through the contractual and statutory dispute resolution procedures and has not made any reasonable effort to resolve the dispute over the pilots' and Union's claimed actions. Therefore, it would be inappropriate to grant it injunctive relief.

## CONCLUSION

For the foregoing reasons, the Defendants, International Brotherhood of Teamsters and Local 1224, respectfully request that the Plaintiff ABX Air's motion for temporary restraining order and preliminary injunction be denied and that this matter be dismissed as outside the Court's jurisdiction. However, should the Court determine not to dismiss this action for lack of subject-matter jurisdiction at this time, it must conduct a full evidentiary hearing in open court and afford both parties the opportunity to present sworn testimony and to cross-examine each other's witnesses, in accordance with Section 7 of the Norris LaGuardia Act.

Respectfully submitted,

**DOLL, JANSEN & FORD**

_/s/ Julie C. Ford_

John R. Doll (0020529) – Trial Attorney
Julie C. Ford (0040896) – Co-Counsel
111 W. First St., Suite 1100
Dayton, OH  45402-1156
(937) 461-5310; (937) 461-7219 (fax)
jdoll@djflawfirm.com
jford@djflawfirm.com

_/s/ Edward M. Gleason, Jr._

Edward M. Gleason, Jr.
_Pro Hac Vice Admission Pending_
Law Office of Edward Gleason, PLLC
910 17th Street, NW, Suite 800
Washington, DC  20006
202-800-0099
egleason@gleasonlawdc.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Daniel J. Buckley
Vorys, Sater, Seymour & Pease LLP
301 E. Fourth St., Suite 3500
Great American Tower
Cincinnati, OH  45202
djbuckley@vorys.com

Andrew D. McClintock
Patricia G. Griffith
Ford & Harrison, LLP
271 17th Street NW, Ste. 1900
Atlanta, GA  30363
amcclintock@fordharrison.com
pgriffith@fordharrison.com

Dannie B. Fogleman
Ford & Harrison, LLP
1300 19th Street NW, Ste. 300
Washington, DC  20036
dfogleman@fordharrison.com

_____*Julie C. Ford*_____