IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ABX AIR, INC., | : | |
| | : | |
|     **Plaintiff,** | : | |
| v. | : | CASE NO. 1:16-CV-1039 |
| | : | |
| INTERNATIONAL BROTHERHOOD | : | JUDGE BLACK |
| OF TEAMSTERS, AIRLINE DIVISION, | | |
| et al., | : | |
| | : | |
|     **Defendants.** | : | |

**DECLARATION OF TIMOTHY JEWELL**

The following declaration is made pursuant to 28 U.S.C. § 1746:

I, TIMOTHY JEWELL, declare that I am over the age of 18 years; I have personal knowledge of the following facts; and I can testify to these facts if called upon to do so.

1.  I am employed by ABX Air, Inc., ("ABX" or "the Company") as a Boeing 767 Captain and have been employed by ABX or one of its predecessor companies since July, 1993.

2.  I have served as the elected Secretary-Treasurer of the Airline Professionals Association, Teamsters Local Union No. 1224, ("Local 1224" or "the Union"), an affiliate of the International Brotherhood of Teamsters, continuously since January 1, 2009. Prior to January, 1, 2009, I served as an elected steward for the ABX pilots for approximately three years. I also was as a member of the Union Negotiating Committee on behalf of the ABX pilots beginning in the latter half of 2007. At that time, the Union and ABX were engaged in collective bargaining negotiations for an amended collective bargaining agreement, and ABX had presented the Union committee with a package offer that Local 1224 submitted to the pilots for a ratification vote. The ABX crewmembers rejected the Company's proposal. Thereafter, I served as a member of the Union negotiating committee on behalf of the ABX pilots in connection with the current CBA, which

became effective at the start of 2010 and generally is referred to as the 2009 contract. I also serve as a member of the Union's Negotiating Committee in the current negotiations to amend the existing (2009) CBA, which began in or about December, 2013. In my capacity as Secretary-Treasurer of the Union, and based on my experience as a Union steward for the ABX pilots and a member of the Union negotiating committee on behalf of the ABX pilots, I am familiar with the terms of the current and prior versions of the CBA between the Union and ABX.

3. I have reviewed the Company's complaint and motion for injunction against the Union and understand the underlying basis for the Company's complaint and motion relates to its pilot staffing difficulties and in particular to the high costs it is incurring in order to staff its operations. The Company's claims and accusations against the Union are not true, and its staffing and financial difficulties are exclusively the product of management's failure to adequately staff its operations. For example, ABX has refused to recall a sufficient number of furloughed ABX pilots and intentionally delayed hiring new pilots to cover its operations until the furloughed ABX pilots lost their recall rights in February 2016. To provide the Court with a better understanding of the Company's self-inflicted staffing difficulties, what follows is an explanation of pertinent scheduling rules set forth in the current and prior versions of the parties' CBA.

4. In the 1997 and 2003 contracts, the scheduling procedures of Article 13 provided that ABX would build regular lines of flying, or work schedules, for each bid period, which generally corresponded to the calendar month. The lines were constructed in accordance with various restrictions and rules governing, for instance, minimum days off during a bid period, rest periods and flight duty limitations during day-night transition. With respect to minimum days off, the 1997 and 2003 versions of the CBA provided that pilots were entitled to a minimum of 15 days off in a bid period for a regular line of flying and 14 days off for a reserve line. Once constructed,

the Company submitted the lines of flying to the pilots, who would then bid in seniority order to obtain the line(s) of flying that they wanted to fly for that period.

5. The scheduling provisions of the 1997 and 2003 versions of the CBA also provided rules of line bidding priority, such that pilots first bid, in seniority order, on "regular" and "reserve" lines of flying and then, later on "open flying." Open flying consisted of trips not incorporated into a regular or consolidated line of flying and was distributed, in seniority order, first to pilots who needed to make their lines "whole," *i.e.,* who had not yet bid for the required number of days of work in the 30 or 31-day bid period, and then, again in seniority order, to pilots who bid for the trips as overtime work.

6. Additionally, the scheduling provisions set forth in the 1997 and 2003 versions of the CBA contained special rules enabling the Company to involuntarily assign open flying days, in reverse seniority order, to line-holding pilots if the pilot group as a whole did not bid the equivalent of one day of flying for the total number of regular lines for that bid period. For example, if ABX constructed and published 60 regular lines of flying in a bid period and the pilot group in total bid fewer than 60 days of open flying, ABX could assign open flying days up to the total of 60. When these two rules were triggered, the Company would first assign, in reverse seniority order, additional unfilled open flying days of flying to the bottom 75 percent of lineholders holding regular lines of flying. If, after completing that process, the requirement still was not satisfied, ABX could then assign one additional day of unfilled open time flying to no more than the bottom 50 percent of pilots, in reverse seniority order. These rules assured enhanced productivity for the benefit of the Company and ensured pilots were required to fly at least a minimum number of additional days in a bid period.

7. The scheduling provisions set forth in the 1997 and 2003 versions of the CBA further contained rules of priority regarding the assignment of remaining, unfilled trips that need to be filled. In this regard, those trips that were not covered through the regular, composite and then open flying bid processes were assigned by the Company to reserve pilots, i.e., pilots who were not awarded a regular lines of flying, or, to a status referred to as "continual open flying, which enabled Union-represented ABX pilots and (non-union) management pilots to select one or more those trips. Under these assignment rules, however, if a pilot bid for open flying or continual open flying the Company was required to award that flying to him; it could not, for example, refuse to assign that flying to the bidding pilot and instead assign it to reserve pilots. This restriction applied even if the pilot bidding for the open flying contractually was entitled to premium (overtime) pay while the reserve pilot was entitled only to regular (straight-time) pay. Finally, if trips remained uncovered after the awarding of the open flying process and the following the assignment of trips to reserve pilots, the Company could involuntarily "emergency assign" pilots in reverse seniority order to fill the trips.

8. The Union and Company made significant changes to the scheduling provisions of Article 13 in the current (2009) CBA. That contract was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL. That loss of business resulted in the furlough of several hundred ABX pilots (who contractually were entitled to seven years of recall rights under the seniority provisions of the CBA), the freeze of the pilots' defined-benefit pension plan, a reduction in their pay, and an increase in work days each month.

9. In the negotiations leading to the 2009 contract, the Company also sought additional productivity under Article 13 in scheduling pilots and staffing its operations. Among other things,

the parties agreed to reduce the minimum days off in a bid period, to 13 in a 30-day period and 14 in a 31-day period, for a total of 17 days of work in each period. ABX also wanted to avoid having to provide premium pay (above the monthly guaranteed salary) to pilots whose schedules changed for reasons beyond the Company's immediate control. The parties reached a compromise agreement on scheduling issues, including by creating a new type of duty day, called a "flex day." Flex days were "placeholder" work days listed in the lines of flying in ABX's Company's monthly bid packets. These dates did not include specific trips, but the bidding pilot would be required to take an assignment on those dates if one arose.

10. In these discussions, and as part of the Union's ongoing emphasis on "quality of life" provisions, Local 1224 wanted to provide the pilots with greater certainty in knowning in advance what days off they would have each month. Therefore, the Union did not want to be bound by a requirement for a minimum level of bidding for open flying and the accompanying "bottom 75/bottom 50" provisions. The parties eventually agreed to change the open flying assignment priority so that ABX was no longer required to assign open flying to pilots who bid for it. Instead, if it chose to do so, the Company could refuse to award such trips to bidding pilots (and thereby avoid paying premium pay) and instead assign that flying to reserve pilots paid at regular (straight-time rates), which was an important cost-savings mechanism for ABX. In partial exchange for these additional productivity and financial concessions, the Company also expressly agreed that "A Crewmember(s) is not required to bid on any open flying."

11. Finally, the parties in the 2009 contract also significantly changed Section 13's emergency assignment (junior manning) rules. The Union and the Company agreed that, if staffing requirements were not met through the use of reserve crewmembers or the use of flex days, ABX could assign trips to crewmembers in reverse seniority order, but with limitations. First, each

crewmember was to be issued only six days of emergency assignments in a calendar year. Initially, the emergency assignment is made to the most junior crewmember who has not previously been emergency assigned that year and who is available at the time the need for the trip is known. During the year, emergency assignments are assigned to crewmembers in reverse order of seniority until the most senior crewmember completes an assignment. The process continues throughout the year as emergency assignments need to be made in reverse order of seniority. The assignment process begins at the bottom of the list and continues to the most senior Crewmember, then begins again at the bottom of the list.

12. While seniority plays a role in emergency assignment of trips, the 2009 CBA now requires that those assignments be made according to the number of emergency assignments a crewmember has completed. Thus, assignments will be made to crewmembers who have been emergency assigned for two days, then three days, and on until a crewmember has completed six days of emergency assignments. For example, if a junior crewmember has completed five days of emergency assignments, he or she will not be called for an additional emergency assignment if other crewmembers have completed fewer than five days of emergency assignments. Exceptions exist such as, for example, when a pilot is the only crewmember available.

13. The parties also agreed that, even after completing six days of emergency assignments, a crewmember could be assigned to a seventh day or more. If that occurred, the crewmember not only would earn the premium pay associated with an emergency assignment but also would have the lost day off restored in that bid month or the subsequent bid month. The pilot selects the work days to be dropped from his or her schedule and notifies Crew Scheduling of the selection. The work days dropped are to be in the same or the next bid period. Only if a crewmember does not have enough work days in the current and subsequent bid period to drop so

that the days off are restored can he or she be paid for those days.  Further, the restored day off is not considered "inviolate" – that is, the pilot may be subject to an emergency assignment on the restored day off, which results in earning the premium pay and *another* replacement day off.  Finally, the parties explicitly agreed that the Company shall not offer and the Crewmember shall not accept pay in lieu of a restored day off, except as described above.

    I have read the foregoing declaration and declare under penalty of perjury, under the laws of the United States, that its contents are true and correct to the best of my knowledge.

_____
Timothy Jewell

    __November 2, 2016_____
    Date