UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ABX AIR, INC., | : | Case No. 1:16-cv-1039 |
| Plaintiff, | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| INTERNATIONAL BROTHERHOOD | : | |
| OF TEAMSTERS, AIRLINE | : | |
| DIVISION, *et al.*, | : | |
| Defendants. | : | |

**ORDER DENYING PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER (Doc. 2)**

This civil action is before the Court on Plaintiff's motion for a temporary

restraining order (Doc. 2) and the parties' responsive memoranda (Docs. 14, 15).

Plaintiff moves for a TRO and preliminary injunction to prohibit Defendants

International Brotherhood of Teamsters ("IBT") and Airline Professionals Association of

the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224")

(collectively, "Defendants") from engaging in unlawful self-help. Plaintiff claims that

Defendants have threatened an imminent strike and orchestrated a ban on voluntary

overtime in order to advance their position in labor negotiations.[1]

Defendants maintain that this Court lacks jurisdiction over Plaintiff's claims

because this matter represents a "minor dispute" under the Railway Labor Act ("RLA")

that may not be adjudicated by the Courts but, rather, must be addressed through dispute

resolution procedures before the System Board of Arbitration, as provided for by statute

---

[1] Defendants deny that the Union has threatened a strike or that it intends to call a strike.
(Doc. 14 at 1).

and contract.

## I.   BACKGROUND FACTS

Plaintiff and Defendants, or their predecessors, have been parties to six collective bargaining agreements since 1983 (except in 1992), with the most recent agreement taking effect on January 1, 2010, and becoming amendable on December 31, 2014.  (Doc. 14-1 at ¶ 3).[2]

The 2009 CBA was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL.  (Doc. 14-7 at ¶ 9).  The parties reached a compromise agreement on scheduling issues, including creating a new type of duty day called a "flex day."  (*Id.*)  Flex days are "placeholder" work days. (*Id.*)  These dates do not include specific trips, but the bidding pilot is required to take an assignment on those dates if one arises.  (*Id.*)

During the 2009 negotiations, the Union was mindful of retaining, to the extent possible, the predictability of the pilots' schedule and protecting their days off.  Most (if not all) crewmembers are on duty in the middle of the night for several consecutive

---

[2]  Plaintiff ABX is a "carrier by air" as defined by the RLA.  (Doc. 1 at ¶ 18).  ABX transports time-sensitive materials nationwide.  Its two primary customers are DHL and AFS, a subsidiary of Amazon.  (*Id.* at ¶¶ 13, 20).

Defendant IBT is a local organization headquartered in Washington, D.C.  (Doc. 1 at ¶ 25).  IBT is the collective bargaining representative of the ABX pilots under the RLA.  Local 1224 is a labor organization headquartered in Wilmington, Ohio.  (*Id.* at ¶ 26).  Local 1224 is a chartered affiliate of IBT, and, as such, provides labor representation services to pilots represented by IBT employees at numerous airlines throughout the United States.  (*Id.*)

days and are away from home while on duty.  Crewmembers fly both domestically and

internationally, frequently changing time zones.  Accordingly, a crewmember's time off

is of utmost importance, and protecting it has always been a priority in negotiations.

(Doc. 14-1 at ¶¶ 4-5; Doc. 14-7 at ¶ 10).

Additionally, the current version of Article 13, Section M.2 of the contract, was

changed to provide that pilots "shall only be given emergency replacement assignments

on six (6) days per Calendar Year except as provided in Section M.5., of this Article."

Section M.5 provides that, for each day of emergency assignment after the first six, the

pilot is to be granted a day off at a later date in the current or subsequent bid month.

These replacement days off are referred to as "D6" days.  In addition, Section M.5

provides: "The selected Work Day(s) that are dropped due to the provisions of this

Section shall be at the discretion of the Crewmember."  However, these restored days off

are not considered "inviolate" days.  A pilot may be compensated financially in lieu of a

make-up day off, but only if he or she does not have enough work days in the applicable

bid period to cover it.  Otherwise, "[t]he Company shall not offer and the Crewmember

shall not accept pay in lieu of a getting a Day(s) Off restored."  (Doc. 14-1 at ¶ 9;

Doc. 14-7 at ¶ 13).

The parties also agreed in the 2009 contract to change certain provisions relating

to open flying assignments, including permitting ABX to assign the trips to reserve pilots

who would be paid at straight time instead of to regular lineholders who would be paid a

premium, an important cost-savings mechanism.  In partial exchange for these additional

productivity and financial concessions, Plaintiff also expressly agreed that crewmembers are "not required to bid on any open flying." (Doc. 14-7 at ¶ 10).

The parties began negotiations to amend the 2009 CBA in late December 2013 or early January 2014. In January 2014, Plaintiff informed the Union that Plaintiff would be furloughing 12 pilots, all in the First Officer position, effective February 2, 2014. After reviewing Plaintiff's staffing levels, the Union pointed out that ABX did not have enough Captains and that ABX was properly staffed in the First Officer position without the furloughs. After several meetings, the parties entered into a Letter of Agreement ("LOA") that required ABX to upgrade five First Officers to Captain positions and provided that those Captains would be dual-qualified for both seat positions — that is, ABX could assign them to serve in the First Officer position at the Captain rate of pay. (Doc. 14-1 at ¶ 6, Ex. A).

On March 4, 2015, Plaintiff issued furlough and surplus notices to certain crewmembers, to be effective on April 4, 2015. The Union again reviewed Plaintiff's staffing and pointed out that the staffing level already was actually too low for the flying that needed to be accomplished. After additional meetings, ABX and Local 1224 entered into another LOA dated March 17, 2015, in which Plaintiff agreed to rescind the furlough and surplus notices. In exchange, the Union gave Plaintiff the discretion to deny crewmembers the option to sell back vacation during the month of May 2015. (Doc. 14-1 at ¶ 7).

4

By April 2015, Captain Ziebarth began to receive complaints from ABX pilots about an increase in emergency assignments to flights on their days off.[3]  In June 2015, Captain Ziebarth received a report that many crewmembers had reached or exceeded six days of emergency assignments in the calendar year already.  (Doc. 14-1 at ¶ 9, Ex. C).

During the first half of 2016, pilots continued to be emergency assigned to trips. By the end of June 2016, 59 percent of Captains and 48 percent of First Officers had reached or exceeded the six-day limit on emergency assignments.  Captain Ziebarth received numerous complaints from crewmembers about the lack of time off and advised them to refrain from bidding open flying, avoid answering their phones, schedule their D6 days, and take other measures to enhance their chances of having some days off. (Doc. 14-1 at ¶ 16).

Plaintiff claims that unless the Court enjoins the concerted refusal by ABX's crewmembers to bid on voluntary overtime and to buy back vacations, ABX will experience service failures in the form of canceled and delayed flights.  (Doc. 1 at ¶ 94). When service failures occur due to an inability to staff its flights, Plaintiff will not be able to operate its freighter aircraft, and thus on a daily basis will be unable to deliver numerous aircraft-loads of packages in a timely manner for DHL and Amazon (and their thousands of customers).  As many as 20,000 individual customers could be affected, per aircraft, by each service failure.  (*Id.* at ¶ 95).  As a result, Plaintiff claims that its reputation will be damaged and the affected customers (DHL and Amazon) may cease

---

[3] Captain Ziebarth has been employed by ABX or one of its predecessor companies since June 13, 1977.  (Doc. 14-1 at ¶ 1).  Ziebarth is the Chair of the Union's Executive Council for the unit of crewmembers employed at ABX.  (*Id.* at ¶ 2).

doing business with Plaintiff.  (*Id.*)  Given the timing of the peak holiday season, Plaintiff claims that Defendants' actions could result in imminent and irreparable harm to Plaintiff, its customers, and the millions of individuals why rely on DHL and Amazon to deliver on time during the holiday season.  (*Id.*)

## II.   STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'"  *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo."  *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).

Plaintiff bears the heavy burden of demonstrating his entitlement to a TRO.  An "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Id.*

6

These four considerations are factors to be balanced, not prerequisites that must be met.

*McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997).

"Although no one factor is controlling, a finding that there is simply no likelihood of

success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d

620, 625 (6th Cir. 2000).

### III.    ANALYSIS

The RLA provides:

> It shall be the duty of all carriers, their officers, agents, and employees
> to exert every reasonable effort to make and maintain agreements
> concerning rates of pay, rules, and working conditions, and to settle all
> disputes, whether arising out of the application of such agreements or
> otherwise, in order to avoid any interruption to commerce or to the
> operation of any carrier growing out of any dispute between the carrier
> and the employees thereof.

45 U.S.C. § 152. The RLA imposes "upon the parties an obligation to make every

reasonable effort to negotiate a settlement and to refrain from altering the status quo by

resorting to self-help while the Act's remedies [are] being exhausted." *Detroit & Toledo*

*Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 149 (1969).

The RLA distinguishes between two categories of labor disputes: "disputes

concerning the making of collective agreements," known as major disputes, and "disputes

over grievances," known as minor disputes. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S.

711, 722 (1945). Major disputes give federal courts jurisdiction; minor disputes must be

submitted to binding arbitration. (*Id.*)

A major dispute is one that arises "where a CBA does not exist or where one of

the parties seeks to change the terms of an existing CBA. The issue in a major dispute 'is

7

not whether an existing agreement controls the controversy'; instead, the focus is on the 'acquisition of rights of the future, not [the] assertion of rights claimed to have vested in the past.'" *Burley*, 325 U.S. at 723. When parties are engaged in a major dispute under the RLA, they must maintain the status quo until they exhaust the major dispute process. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302-03 (1989). If either side unilaterally alters the status quo, "[a] court may issue an injunction to put a stop to that party's illegal self-help and to restore the status-quo, and it may do so even without the traditional showing of irreparable injury to either party." *United Air Lines, Inc. v. Int'l Ass'n of Machinist Aerospace Workers, AFL-CIO*, 243 F.3d 349, 361 (7th Cir. 2001).

A "minor dispute" is a dispute arising out of the interpretation of an existing CBA. *Airline Prof'ls Ass'n, Teamster Local Union 1224, ABX Air, Inc*, 400 F.3d 411, 414 (6th Cir. 2005). As the Supreme Court has held:

> Minor disputes grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. Minor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation[,]… develop from the interpretation and/or application of the contracts between the labor unions and carriers…[and] pertain[] only to disputes invoking contract-based rights.

*Hawaiian Airlines v. Norris*, 512 U.S. 246, 252-54 (1994). Significantly, "the RLA precludes the federal courts from granting relief on minor disputes that have not first been brought through the RLA arbitration process." *Emswiler v. CSX Transp.*, 691 F.3d 782,

789 (6th Cir. 2012).[4] Moreover, "[t]here is a strong presumption that a dispute between parties to an RLA agreement is minor." *Airline Prof'ls Ass'n v. ABX Air, Inc.*, No. 1:07cv820, 2007 U.S. Dist. LEXIS 95124 (S.D. Ohio Dec. 14, 2007). And the party attempting to establish that the dispute is minor has a "relatively light burden." *Conrail v. Ry. Labor Executives' Ass'n*, 291 U.S. 299, 307 (1989).

The Court finds, and Plaintiff concedes, that the parties' dispute over automatically awarding D6 Days (questions about whether crewmembers may decline to bid for open flying time or sell back their vacation) is a "minor dispute." (Doc. 2 at 14).

Nonetheless, Plaintiff maintains that, given the facts of this case, it is entitled to injunctive relief as the RLA authorizes injunctive relief to prevent an illegal strike. *Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 40 (1957). In *Chicago River*, the Supreme Court found that the parties were engaged in a minor dispute and held that the union was bound by the FLA's "unequivocal" language not to strike, and instead had to use the arbitration procedures made mandatory by the Act. *Id.* at 32. The Court then determined that "the federal courts can compel compliance with the provisions of the Act to the extent of enjoining a union from striking to defeat the jurisdiction of the Adjustment Board." *Id.* at 39. "[T]his implied right of action created in *Chicago River* exists under the RLA although the statute is silent as to any such right."

---

[4] *See, e.g.,* "*Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001) (minor disputes are "subject to compulsory and binding arbitration[.]" ); *Kaschak v. Consol. Rail Corp.*, 707 F.2d 902, 904-05 (6th Cir. 1983) (minor disputes are outside a federal court's jurisdiction and are subject to dismissal pursuant to Rule 12(b)(1)).

*CSX Transp. Inc. v. Marquar*, 980 F.2d 359, 363 (6th Cir. 1992). However, here, there is no evidence that the Union has threatened a strike or that it intends to call a strike. (Doc. 14 at 1).

Next, Plaintiff alleges that the "ban" on taking D6 Days has disrupted interstate commerce and therefore injunctive relief is warranted.[5] However, in the previous ABX-IBT litigation, the Sixth Circuit concluded that the actions of the Union and the crewmembers in making decisions not to bid on voluntary open flying was not a strike nor an interruption of operations, even though the actions cost Plaintiff substantial amounts in premium pay and caused it to forego bidding for certain customer contracts. Specifically, the Sixth Circuit held that

> the dispute between ABX and the Union is a minor one, during which there is no requirement to maintain the status quo, thus making certain types of concerted action available that would not be during a major dispute. Indeed, we cannot find any case in which a union was held to have violated the RLA during a minor dispute by encouraging its members to refrain from engaging in conduct that is voluntary under a CBA.

---

[5] Plaintiff cites Ziebarth's deposition where he "advised [pilots] to refrain from bidding open flying." (Doc. 14-1 at ¶ 16). Plaintiff maintains that Ziebarth's statement encouraged concerted action in violation of the RLA. Specifically, Plaintiff argues that a union's concerted effort to avoid open flying violates the RLA's status quo requirements. *See, e.g., Delta Air Lines v. Air Line Pilots Ass'n Int'l*, 238 F.3d 1300, 1311 (11th Cir. 2001) (ordering district court to issue "appropriate injunctive relief directing union to take further steps to end the pilots' no-overtime campaign"); *US Airways, Inc. v. U.S. Airline Pilots Ass'n*, 813 F. Supp.2d 719, 731 (W.D.N.C. 2011) (The RLA's prohibition on self-help applies to union action which has the same consequence as a strike, such as refusal of overtime); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009) (RLA "prohibits employees from engaging in concerted action to put economic pressure on a carrier even where the employees have a right under the existing collective bargaining agreement to take the action in question."). The Court notes that none of these cases is binding precedent. Moreover, the Court notes the importance of considering the context of Ziebarth's statement. Ziebarth claims that "he received numerous complaints from crewmembers about lack of time off" and so he "advised them to refrain from bidding open flying, avoid answering their phones, schedule their D6 days and take other measures to enhance their chances of having some days off." (Doc. 14-16 at ¶ 16).

*ABX Air, Inc. v. Airline Prof'ls Ass'n, Teamsters Local 1224 ("Open Flying I")*, 266 F.3d 392, 398 (6th Cir. 2001) (emphasis supplied).  The same reasoning applies here.

Plaintiff maintains that this case is distinguishable from *Open Flying I*, because now Plaintiff has exhausted all of its staffing options (new hires, management flying, junior manning) and ABX pilots have accumulated enough D6 Days be entitled to days off for the entire peak shipping season over the holidays.  As a result, flights have been delayed and canceled which shows a change in the status quo.  However, the contract gives each pilot the individual, unfettered choice of whether to bid on open flying time and provides the pilots with the right to select, without restrictions, a D6 replacement day off for every day they are emergency-assigned after the sixth time in a calendar year.  Finally, although the CBA offers those who wish to work in lieu of taking their vacation time the opportunity to sell their time back to the Company, there is nothing that requires the pilots to do so.  Crew members may choose to sell back their vacation time or use it, at their option.  <u>Defendants cannot have violated the RLA by engaging in action permitted by the CBA</u>.

In support of its argument, Plaintiff maintains that "ABX's flight operations functioned adequately prior to the Union's surreptitious call for this job action."  (Doc. 15 at 8).  But that allegation is undermined by the fact that by the end of the first quarter of 2016, approximately 40 percent of ABX captains and 33 percent of its first officers had already been forced to fly the contractually allowed emergency assignments.  (Doc. 14-1 at ¶ 16).  Defendants maintain that the staffing shortage is the product of management's

refusal to adequately staff its operations.  In fact, the Union repeatedly questioned Plaintiff's staffing assumptions and pointed out that its bare-bone staffing model would cause long-term problems.  (*Id.* at ¶ 10).

In sum, this Court lacks jurisdiction over Plaintiff's claims because this matter represents a "minor dispute" under the RLA that must be addressed through  dispute resolution procedures before the System Board of Arbitration, as provided for by statute and contract.

## IV.   CONCLUSION

For these reasons, Plaintiff's motion for a temporary restraining order and preliminary injunction (Doc. 2) is **DENIED**, and this civil action is **DISMISSSED** pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction.  The Clerk shall enter judgment accordingly, whereupon this civil action is **TERMINATED** on the docket of this Court.

**IT IS SO ORDERED**.

Date:  11/7/16                                                           *s/ Timothy S. Black*
                                                                             Timothy S. Black
                                                                             United States District Judge